# Supreme Court of Florida

_____

No. SC15-1252
_____

**EDWARD ALLEN COVINGTON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[August 31, 2017]

PER CURIAM.

Edward Allen Covington appeals his convictions and death sentences for the first-degree murders of Lisa, Zachary, and Heather Savannah Freiberg. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons we explain, we affirm the convictions and sentences.

## I. BACKGROUND

In May 2008, Lisa Freiberg lived in Lutz, Florida, with her two children, seven-year-old Zachary and two-year-old Heather Savannah, and her boyfriend, Edward Allen Covington. Covington met Lisa through an online dating site and

moved into her home in April 2008. On May 11, 2008, Covington murdered Lisa, Zachary, and Heather Savannah. He also killed the family dog, Duke.

Three days before the murders, Lisa's mother, Barbara Freiberg, noticed that Heather Savannah had a swollen lip. When Barbara asked about it, Covington said that he must have caused it by rubbing too hard when wiping Heather Savannah's face. The next day, Friday, May 9, 2008, Barbara noticed that Heather Savannah also had hand prints and bruises on her buttocks and that the inside of her swollen lip was cut. Barbara photographed Heather Savannah's injuries and showed them to Lisa later that day. Barbara told Lisa that she believed that Covington was responsible for the injuries. Zachary and Heather Savannah spent the night with Barbara that night. When Lisa picked the children up around noon the next day, Lisa told Barbara that Covington said that it had to have been the babysitter who caused Heather Savannah's injuries.

Around 2 p.m. that Saturday, Covington's probation officer, Stephanie Laureno, stopped by Lisa's home to see Covington. Covington, Lisa, and the children were all home at the time. According to Laureno, Covington appeared calm, did not say anything that was alarming or concerning, and his interactions with Lisa and the children seemed normal.

That evening, Tom Fish, who is Lisa's ex-boyfriend and Heather Savannah's father, asked Lisa to bring the children to his mother's house for family pictures.

Lisa and Covington brought the children to Fish's mother's house, but Covington did not go into the house at first. At some point, Covington did go into the house and visited with Fish and his family for about forty-five minutes. During the visit, when Zachary referred to Fish as "Tom-Tom," Covington corrected Zachary and insisted he address Fish as "sir." Covington explained that he believed in being strict with children. Fish did not observe anything unusual about Covington's speech or demeanor.

The following day was Mother's Day, and Barbara was surprised that she did not get a call from Lisa. On Monday, May 12, 2008, when Lisa did not drop the children off at the babysitter's house as expected, Barbara and her husband drove over to Lisa's house to check on her. When Barbara opened the door and looked into the house, she saw Zachary's deceased, nude body and called 911.

Law enforcement responded to the scene and found the home in complete disarray. The furniture was turned over and there was blood on the floors, walls, and surfaces in every room except the bathroom. In addition to Zachary's body, they found the bodies of Heather Savannah, Lisa, and the dead dog at various locations throughout the house. Heather Savannah had been dismembered and decapitated. Zachary's genitals had been mutilated. Lisa's body was in the doorway of the master bedroom, with a bloody handprint on the wall nearby. The dog's body was on the floor in Heather Savannah's bedroom. Two hammers and

five knives that appeared to have been used in the murders were found and collected. A mesh bag containing bloody clothing was found under the mattress in the master bedroom.

Law enforcement found Covington in a closet in one of the bedrooms. He indicated that he had taken a number of pills. Depakote and Seroquel pills prescribed to Covington were found in the house. Covington was medically cleared by paramedics at the scene but transported to the hospital for further diagnosis and clearance. As he was being transported to the hospital, Covington looked back and stated, "I can't believe what I've done." After Covington was released from the hospital on May 14, 2008, he was transported to the Sheriff's Office, where he was interviewed by detectives and confessed to the murders.

Covington was indicted for three counts of first-degree murder, three counts of abuse of a dead body, and one count of cruelty to an animal. A jury was sworn and opening statements were heard on October 22, 2014. On the first day of trial testimony, October 23, 2014, Covington announced that he wanted to change his pleas to guilty and waive a jury for the penalty phase. The trial court would not accept Covington's guilty pleas at that time but instead appointed two experts to evaluate Covington's competency to plead guilty. The evaluations and the doctors' reports were completed that evening.

When court reconvened the next day, Covington was given time to meet with his attorneys and his family. Covington then reaffirmed his desire to plead guilty and waive a penalty phase jury. Covington's counsel supported his decisions to plead guilty and waive a penalty phase jury. The court then conducted a comprehensive plea colloquy with Covington during which the court thoroughly informed him about the rights he was waiving. Covington indicated both verbally and in writing that he understood the consequences of his pleas, that although he was on psychiatric medications, there was nothing that would impair his understanding of his decision, and that he was not being threatened or coerced into entering the pleas. The trial court accepted Covington's pleas of guilty to all seven counts as charged in the indictment. Covington reaffirmed his desire to waive a penalty phase jury, and the trial court accepted his waiver. The parties stipulated that as part of the penalty phase, the trial court should consider the testimony of the four witnesses who had testified during the abbreviated guilt phase.

Covington's May 14, 2008, interview with detectives was played at the penalty phase. In the interview, Covington said that he met Lisa through an online dating site in August 2007, and they hit it off. He said that he had been living with Lisa on and off but officially started living with her a couple of weeks before the murders and everything was going great. He said Lisa and the children loved him. He talked about the days leading up to the murders. He said that he and Lisa were

having problems potty-training Heather Savannah and that she had not been eating properly. He knew that Barbara had seen marks on Heather Savannah and that she thought he was abusing the children. Barbara told Lisa that she did not want Lisa to take the children back home while Covington was there. Covington denied abusing the children and said it "really, really ticked [him] off" that Barbara thought he was. He admitted that he had hit Heather Savannah on the leg when she picked up a cell phone a couple of days before the murders but said he did not mean to hit her hard. He also admitted that the marks could have occurred when he spanked Heather Savannah, but he said he did not realize he spanked her that hard.

Covington said that Lisa picked up the children from Barbara's on Saturday afternoon, the day before the murders. Covington prepared lunch for the children and dinner for the four of them. They ate dinner around 6 p.m. and then took the children to visit with Fish's family. While the children and Lisa were visiting, Covington said he needed to go check his mailbox and left, but he actually went to buy and smoke crack cocaine.

According to Covington, when they got home around 9:30 p.m. or 10 p.m., the children went to bed, and Covington and Lisa had a drink together and had sex. Covington then played a computer game. He and Lisa went to bed around midnight or 1 a.m. Before bed, Covington said he "took a handful of Seroquel"

because he was "dog tired" and it had not been as effective recently. He said he took roughly 1,000 milligrams of Seroquel (including four 200-milligram, extended release pills), which he described as "a hundred [milligrams] over the max[imum] safe dose." Covington said when the Seroquel works properly, "it's like turning off a light switch. . . . [A]ll the extra thought . . . shuts off, everything goes quiet." The extended release Seroquel was new to Covington and he said the first time he took one 200-milligram pill, the effects lasted twenty-six hours. Covington said that Lisa fell asleep in his arms. Covington initially told the detectives that he did not know what happened next, but he then admitted that he "kind of" remembered what happened the next morning and described what he said he remembered about the murders.

Covington said that Lisa and Zachary were still in bed around 10:30 Sunday morning when he found Heather Savannah awake and lying on the couch in the living room. Covington asked Heather Savannah "what she was doing up and she just started to cry." He said "that is the last recollection of being in control I know of" and the next thing he remembered was all the chaos and killing. He said that he killed Heather Savannah first, that he "hurt her the most," and that he "cut her in half" with a bread knife. He said the first thing he did was cut Heather Savannah's throat, "the jugular," while she was lying on the couch and he was standing over her. He used four back-and-forth motions. He said he then "literally ripped

Savannah in half," "almost like carving a pig." He said he had to get her undressed in order to cut her in half. He believed she was dead at that time but could not be sure. He also decapitated Heather Savannah and set her head by the front door. Although he initially said Heather Savannah was crying, he later said she never yelled or cried. He specifically remembered that the bread knife he used on Heather Savannah was bent in the process. When asked about a bite mark on Heather Savannah's arm, he said he may have left that the night before, because she was biting Zachary and in order to "break[] her on that[,] . . . we would bite her back."

After he killed Heather Savannah, Covington remembered choking and strangling Lisa. He said he did not remember punching her but thought he might have because he remembered her having a bloody face. He said he used a two-and-a-half-inch-wide butcher knife and an upward motion to stab her in the chest, which he believed "probably perforated the heart and the lung."

Zachary was still asleep in his top bunk when Covington stabbed him. Zachary did not say anything during the stabbing, and Covington thought that was because he stabbed Zachary's heart. He thought he stabbed Zachary three times, once in the back and twice in the chest cavity. He remembered a "chopping knife" breaking off inside Zachary when it hit bone. Covington then brought Zachary to

the living room and removed his scrotum and penis. He said that the mutilation did not have a sexual basis and that he used pliers to touch Zachary's penis.

Covington killed Duke last, by punching him and hitting him with a hammer.

Covington said that after Lisa was dead, he kept hearing her voice, so he cut her again. Then he "got what [he] could find of Savannah and Zachary and put 'em over by the front door." He remembered calling his ex-wife, Cheri, twice, but she did not answer, and he thought he may have left a message the second time he called.[1]

Covington said that at some point he thought this must be a nightmare and that he better take some more Seroquel. He thought it was at that time that he took Depakote, aspirin, Tylenol, and caffeine. He vaguely remembered falling down in the closet while he was looking for clothes. The next thing he remembered was the police officers telling him to get out of the closet. He did not know how long he had been in the closet but remembered that it was daylight when he went in.

Covington described himself to detectives as a time bomb that had been waiting to explode and finally blew up. He said he did not know why he blew up because Lisa, Zachary, and Heather Savannah did nothing wrong.

---

    1. Covington later was able to remember not only that he did leave Cheri a message but exactly what he said in the message.

Dr. Leszek Chrostowski, the medical examiner who performed the autopsies, testified about the causes of the victims' deaths and the injuries they received.

Lisa's death resulted from a knife wound to her neck, which transected her trachea, esophagus, and left common carotid artery. It was a gaping wound, eleven centimeters long, which appeared to have been made by a back-and-forth sawing motion with a knife. Prior to the infliction of the fatal wound, Lisa suffered severe injuries to her face, which were likely caused by a beating. Lisa had contusions and abrasions to her shoulders and chest, a five-inch cut and stab wound to her left breast, a superficial, eight-centimeter laceration across her abdomen, which extended into a twenty-eight-centimeter abrasion, and contusions on her right foot, all of which were inflicted when she was still alive. She also had multiple cuts to her hands and fingers, which were consistent with defensive wounds. She suffered a perimortem[2] skull fracture, consistent with blows from the smaller hammer found at the scene, which caused the whole area at the base of her skull to become fragmented. Based on the fact that there were multiple injuries on all of Lisa's body surfaces in different planes, Dr. Chrostowski opined that Lisa was conscious

2. Perimortem means at or near the time of death or, more specifically, while a person is losing blood pressure and in the process of dying.

during the attack, moving around and trying to escape the injuries. Stab wounds to her abdomen and pubic region were inflicted after her death.

The cause of Heather Savannah's death was a cut to the front of her neck. Prior to the infliction of the fatal wound, Heather Savannah was severely beaten— her cheek was cut down to the bone, the top of her head was cut with a knife in a scalping motion, and both of her femurs were fractured. The femur fractures were spiral fractures, which Dr. Chrostowski said is "a hallmark of child abuse" that results from "jerking" a child. Dr. Chrostowski opined that the leg fractures and head trauma occurred when Heather Savannah was "grabbed by the legs and hit against something." After death, Heather Savannah's body was fragmented. She was decapitated and her torso was cut from the genital region through the chest. Her right leg and hip were entirely removed from the body. Heather Savannah also suffered postmortem fractures to her tibia and fibula and multiple stab wounds to her chest and abdomen.

Zachary died as a result of five stab wounds to his neck and back, which caused internal injuries to his vessels and organs, including his heart. Prior to his death, Zachary's skull was fractured in a manner consistent with blows from the larger hammer found at the scene. Prior to the infliction of the fatal wounds, Zachary was also stabbed in the sacral region, during which the knife broke and the blade was left embedded in the bone. A different knife was later used to inflict the

fatal stab wounds. A large, gaping wound to the front of Zachary's body, which exposed some of his internal organs, was inflicted perimortem. After Zachary was dead, his genitals were removed, additional stab wounds were inflicted to his chest and back, and decapitation was attempted.

Dr. Chrostowski also determined that the blows to Duke's head were consistent with the larger hammer found at the scene.

At the penalty phase, Covington presented mitigation mainly through his parents and several experts, including Dr. Daniel Buffington, a clinical pharmacologist; Dr. Alfonso Saa, a psychiatrist; Dr. Valerie McClain, a psychologist; Dr. Harry Krop, a psychologist; and Dr. Bala Rao, a psychiatrist.

The evidence presented in mitigation established that when Covington was a newborn in 1972, he was given a massive overdose of an antibiotic, which caused him to permanently lose thirty percent of his hearing. The hearing loss was especially upsetting to Covington because it prevented him from becoming a Navy pilot. But Covington received a settlement from the hospital and used the money to hire a private flight instructor and obtain a pilot's license at the age of seventeen. Covington was a good student and did not get into trouble in school. He was employed with the Florida Department of Corrections (DOC) from 1996 to 2006.

Covington has a long history of mental health issues and substance abuse beginning at age fifteen, when he was first hospitalized for mental health

treatment, diagnosed with a "chemical imbalance,"[3] and prescribed medication. He was later diagnosed with bipolar disorder and hospitalized on a number of occasions over the years. Covington was not always compliant in taking his prescribed medications and would self-medicate with drugs and alcohol. While working for the DOC, Covington was abusing cocaine and opiates. Covington stopped working for the DOC because he was getting very paranoid due to his cocaine use. Covington described cocaine to Dr. Krop as "like a mistress, like a siren calling to me." Covington told Dr. Krop that he spent $200-250 per week on cocaine during the same time period in which he complained that his psychiatric medications were financially unavailable to him. Covington admitted that he was aware for years prior to the murders that every time he used alcohol and cocaine it triggered a rage reaction in him and could cause him to lose control, but he drank almost a half-liter of alcohol and used crack cocaine the night before the murders anyway.

A few weeks before the murders, in April 2008, Covington was involuntarily committed under the Baker Act. Sometime between the end of March and the April commitment, Covington had discontinued his prescribed medications, but the

---

3. According to Dr. McClain, Covington was not old enough at age fifteen to be diagnosed with bipolar disorder and his first bipolar diagnosis was in 2000 at the age of twenty-eight.

medications, including Seroquel and Depakote, were reinitiated during the April commitment. However, Covington admitted during evaluations conducted before trial that he had again stopped taking his medications about a week before the murders because he was unhappy that they were causing him sexual dysfunction.

Covington's mental health records indicated a pattern of providing false information to mental health professionals in order to manipulate the system to get what he wanted. When Covington was committed in April 2008 after cutting his arm, he told the healthcare providers at the hospital that he only hurt himself to get his medications and said, "You have to abuse and work the system." But Covington later told Dr. Rao that the hospitalization was actually prompted by a crack binge, after which he became psychotic and paranoid.

Dr. McClain was retained by the defense to evaluate Covington for competency, sanity, and mitigation. She diagnosed Covington with bipolar disorder I, alcohol dependence or moderate-use alcohol disorder, cocaine use disorder, and intermittent explosive disorder. She described Covington as an intelligent man. She believed that Covington was self-medicating with cocaine and alcohol and noted that his mental health records revealed that virtually every time he was hospitalized from the time he was fifteen years old, cocaine or alcohol abuse was involved. Dr. McClain opined without elaboration that Covington qualified for both mental health statutory mitigators. See § 921.141(6)(b), Fla.

Stat. (2014) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance."); § 921.141(6)(f), Fla. Stat. (2014) ("The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.").

Dr. Krop was also retained by the defense to evaluate Covington. Dr. Krop diagnosed Covington with bipolar disorder II, polysubstance abuse disorder, and possibly intermittent explosive disorder. Dr. Krop thought Covington might have intermittent explosive disorder based on certain violent incidents in his history, including a time when Covington broke his sister's nose, held a gun to her head, and slammed her into the wall, an incident with a property manager, and the killing and dismembering of his ex-wife's cats. Dr. Krop conducted neuropsychological testing on Covington and found no frontal lobe deficits.

Covington told Dr. Krop that the morning of the murders, he came out of his room to find the phone so that he could make a call and get more drugs and that he went into a rage when he saw Heather Savannah playing with a cell phone. Covington told Dr. Krop that the rage he felt towards Heather Savannah before the murders was so extreme because he was coming down from crack cocaine and alcohol. When Dr. Krop asked Covington why he killed Zachary, Covington said that he had no motive and "was just a coldblooded killer at the time."

Dr. Krop opined that Covington qualified for both statutory mental health mitigators. He stated that Covington's extreme mental or emotional disturbance was due to stress relating to being on felony probation for an unrelated charge, his issues with Lisa's mother, his concern that the Department of Children and Families might become involved with Lisa's family, his unemployment, and his substance use.

Dr. Rao also evaluated Covington for the defense. Dr. Rao diagnosed Covington with bipolar disorder II and also opined that he qualified for both statutory mental health mitigators. When Covington discussed with Dr. Rao the events surrounding the homicides, he admitted that he picked up Heather Savannah and threw her at the couch and that she probably hit the wall. He said that Lisa then came out of the bedroom because she heard Heather Savannah screaming and that was when he attacked Lisa.

The State called two psychiatrists in rebuttal—Dr. Wade Myers and Dr. Emily Lazarou.

Dr. Myers diagnosed Covington with antisocial personality disorder (ASPD) with traits of sexual sadism and cocaine use disorder. Dr. Myers noted that during his relationship with Lisa, Covington told his ex-wife that Lisa and her children were a burden and that he would really like to get rid of them and get back together with her. Dr. Myers also described examples of Covington's significant history of

violence, including violence toward his sister (breaking her nose), violence toward his ex-wife (knocking several of her teeth out and breaking her wrist), the joy he got out of hurting people when he played football, and his assault on another inmate.

Dr. Myers believed that Covington's cocaine abuse was misdiagnosed as bipolar disorder. Dr. Myers reviewed Covington's mental health records and saw multiple indications of a history of bipolar disorder, but Dr. Myers took that to mean that Covington was telling the healthcare providers that he had bipolar disorder and it was his self-report that was documented in the records. Although records from many of Covington's commitments under the Baker Act indicated a bipolar diagnosis, Covington tested positive for cocaine during many of those admissions, and Dr. Myers explained that bipolar disorder cannot be diagnosed while someone has cocaine in his system and appears manic. Dr. Myers stated that every time Covington went to the hospital under the Baker Act he was agitated, hostile, threatening, angry, and appeared manic, and within a day or two, he was polite and cooperative even though mania does not go away within two days.

Dr. Myers concluded that Covington did not qualify for either statutory mental health mitigator. Covington told Dr. Myers that he knew he should not have smoked crack the day before the murders but did so anyway. Covington said that he can handle cocaine, but when he mixes cocaine and alcohol, he really has

problems. While playing his computer game the night before the murders, Covington took on a leadership role over other players, which Dr. Myers said showed that he had a high degree of cognitive functioning. The only delusion or hallucination that Covington described was hearing Lisa's voice after she was dead, at which point Covington said he got a knife and stabbed her some more to make sure she was dead. Dr. Myers believed that Covington took an overdose of medication after the murders in order to manipulate law enforcement into thinking that he was suicidal and mentally ill. Dr. Myers described Covington as "a very, very bright man." Dr. Myers mentioned that as Covington was being led out of the house after the murders, he stepped on Lisa's corpse, which indicates a lack of remorse.

Dr. Lazarou diagnosed Covington with ASPD, borderline personality disorder, severe cocaine use disorder, alcohol use disorder, moderate opiate use disorder, and psychopathy. Based on her interviews with Covington and review of the records and evidence, it was her opinion that Covington does not suffer from bipolar disorder. She explained that the basis for her opinion is that mania which is not caused by substance use must exist for a bipolar disorder diagnosis, but Covington has never had mania that was not substance-induced. She opined that Covington's manic episodes were a side effect of his cocaine use, not a psychiatric

illness. Dr. Lazarou did not believe that Covington qualified for either statutory mental health mitigator.

As to the murder of Lisa Freiberg, the trial court concluded that three aggravating circumstances were proven beyond a reasonable doubt: (1) the capital felony was especially heinous, atrocious, or cruel (great weight); (2) Covington was previously convicted of another capital felony or of a felony involving the use or threat of violence (great weight); and (3) the capital felony was committed while Covington was on felony probation (minimal weight).

As to the murder of Zachary Freiberg, the trial court concluded that four aggravating circumstances were proven beyond a reasonable doubt: (1) Covington was previously convicted of another capital felony or of a felony involving the use or threat of violence (great weight); (2) the victim of the capital felony was a person less than twelve years of age (great weight); (3) the capital felony was committed while Covington was on felony probation (minimal weight); and (4) the victim of the capital felony was particularly vulnerable because Covington stood in a position of familial or custodial authority over the victim (great weight).

As to the murder of Heather Savannah Freiberg, the trial court concluded that five aggravating circumstances were proven beyond a reasonable doubt: (1) the capital felony was especially heinous, atrocious, or cruel (great weight); (2) Covington was previously convicted of another capital felony or of a felony

- 19 -

involving the use or threat of violence (great weight); (3) the victim of the capital felony was a person less than twelve years of age (great weight); (4) the capital felony was committed while Covington was on felony probation (minimal weight); and (5) the victim of the capital felony was particularly vulnerable because Covington stood in a position of familial or custodial authority over the victim (great weight).

The trial court found that two statutory mitigating circumstances were established: (1) the capital felony was committed while Covington was under the influence of extreme mental or emotional disturbance[4] (moderate weight); and (2) Covington has no significant history of prior criminal activity (moderate weight). The trial court also found that twenty-four nonstatutory mitigating circumstances were established: (1) Covington suffers from bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder (great weight); (2) Covington's capacity to conform his conduct to the requirements of the law was diminished due to his mental illness and his voluntary use of cocaine and alcohol[5]

_____

4. But the trial court noted that Covington's "mental or emotional disturbance, and his rage and violence, were precipitated by his voluntary use of cocaine, alcohol, and his voluntary discontinuing of his psychotropic medications because they caused him sexual dysfunction, knowing such would precipitate rage and violence."

5. Covington proposed the statutory mitigating circumstance that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired due to his mental illness,

(moderate weight); (3) Covington's mother suffered with gestational diabetes during her pregnancy with him and delivered prematurely (no weight); (4) Covington suffers a life-long hearing loss due to an antibiotic overdose at the age of three weeks (no weight); (5) Covington had two major head injuries resulting in loss of consciousness at ages seven and twelve (no weight); (6) Covington was diagnosed and treated for sleep apnea due to obesity (no weight); (7) Covington went through gastric bypass surgery to improve his physical health (no weight); (8) Covington suffered several medical complications following his gastric bypass surgery, which led to additional surgeries to repair abdominal obstructions (no weight); (9) Covington was a good high school football athlete and graduated with average grades (no weight); (10) Covington received a private pilot's license at age seventeen (no weight); (11) Covington was rejected from entering the Navy due to hearing loss, which deeply affected his future goals (no weight); (12) Covington earned numerous training certificates before and during his ten years of employment with the DOC and he was subsequently accepted into an electrical apprenticeship program (minimal weight); (13) Covington was awarded a

_____

but the trial court found that his ability to appreciate the criminality of his conduct was not impaired because of his mental illness and that his ability to conform his conduct to the requirements of the law was not substantially impaired due to his mental illness but was merely diminished due to his mental illness and his voluntary use of cocaine and alcohol.

certificate of appreciation in 1999 for assisting law enforcement in a domestic incident by coming to the assistance of the adult and child victims (moderate weight); (14) Covington has the ability to form positive friendships (minimal weight); (15) Covington's parents love and care for him and have been constant sources of support and will continue to support him (minimal weight); (16) Covington did not resist law enforcement and cooperated with detectives during the investigation of the murders (moderate weight); (17) Covington expressed remorse during his initial interviews with detectives, to expert witnesses, and directly to the Freiberg family (moderate weight); (18) Covington's risk for violence decreases with every year of incarceration based on a published research study (minimal weight); (19) Covington's risk for violence will decrease with stabilization of his psychotropic medications (minimal weight); (20) Covington is intelligent and can help others through education (no weight); (21) Covington has a diagnosis of bipolar disorder and can be helpful to prison medical staff as they treat others with similar symptoms (no weight); (22) Covington and his parents want to work to increase public awareness of bipolar disorder and the need for access to low-cost medications for treatment (no weight); (23) Covington has conformed to incarceration and has had no disciplinary actions since 2012 (minimal weight); and (24) Covington pleaded guilty and acknowledged responsibility for the deaths of a mother and her children, thereby sparing the family of the victims the trauma of a

trial (moderate weight). The trial court rejected two proposed nonstatutory mitigating circumstances—that a death sentence should not be based on emotions and that society can be protected and justice served by a sentence of life without parole—finding that they constituted argument rather than mitigating factors.

In addition to the three death sentences, the trial court sentenced Covington to concurrent sentences of fifteen years for each of the three counts of mutilation of a dead body and five years for cruelty to an animal. This appeal follows.

## II. ANALYSIS

### A. Application of the "Particularly Vulnerable" Aggravator

Section 921.141(5)(m), Florida Statutes (2014), provides as an aggravating circumstance that "[t]he victim of the capital felony was particularly vulnerable . . . because the defendant stood in a position of familial or custodial authority over the victim."[6] The trial court concluded that this aggravator was proven beyond a reasonable doubt as to the murders of Zachary and Heather Savannah. Covington contends that the finding of this aggravator was erroneous because the trial court did not make a finding that the children were "particularly vulnerable" but stated only that Covington was "in control over the conduct and discipline of both children victims for several weeks; in effect he was a parent figure." We disagree.

6. The same aggravating factor is now found in section 921.141(6)(m), Florida Statutes (2016).

- 23 -

"The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence." Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007). "When reviewing a trial court's finding of an aggravator, 'it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job.'" Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009) (quoting Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997)). This Court reviews the record to "determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent[,] substantial evidence supports its finding." Id.

In concluding that the "particularly vulnerable" aggravator was applicable to Zachary and Heather Savannah's murders, the trial court stated:

> At the time of the murders, according to Edward Covington, he had been living with Lisa, Zachary and Heather Savannah since the end of April, or approximately two weeks. In that period of time, by his own description, Edward Covington assumed a parental role with the two child victims. According to him "the kids loved (him)." He participated in the "potty training" of Heather Savannah. He cooked for Heather Savannah and would withhold bread and vegetables from the child to ensure that she would eat her meat first. He participated in bathing her. He described having "Zachary in the kitchen with (him) as much as possible" in order to teach him how to cook. In recounting Zachary's tendency to run off at events, Edward Covington insisted that "we have been having problems with Zachary." He educated Zachary on the dangers of running off by showing him the Florida Department of Law Enforcement's (FDLE) computerized

- 24 -

database which showed the locations of pedophiles.  Mr. Covington admitted warning Zachary that should he keep running off, "we are not going to let you go to church . . . (and) we will put you on a leash like the kids at the park."  He admitted shouldering some of the household duties to lighten Lisa's burden.  According to him, while Lisa Freiberg was at work, he cooked for the family and cleaned the dishes to give Lisa "a little time off from the kids."  His role as a live-in parental figure to Zachary and Heather Savannah heightened their vulnerability to his violent character.

(Alteration in original.)

There is evidence in the record that at the time of the murder, Covington had been dating the children's mother for about nine months and had been "officially" living in the victims' home for several weeks.  Covington had stepped into the role of having familial or custodial authority over the children by virtue of the fact that he cared for the children while their mother worked, cooked for them, cleaned them, disciplined them, encouraged them to eat right, taught Zachary about dangerous people in the world, helped potty-train Heather Savannah, and had a "parent-like" relationship with them.  His role as an authority figure over the children explains why Heather Savannah allowed Covington to approach her on the morning of her murder even though she knew he was angry with her.  And Covington was able to approach a sleeping Zachary in his bed and stab him by virtue of his role as a parental figure in the home.  Thus, there is competent, substantial evidence in the record to support the trial court's conclusion that the

children were particularly vulnerable to Covington due to the nature of their relationship with him.

### B. Application of the HAC Aggravator to Heather Savannah's Murder

Covington asserts that there is no competent, substantial evidence to establish that Heather Savannah was conscious during the attack and aware of her impending death and therefore the trial court erred in finding that the especially heinous, atrocious, or cruel (HAC) aggravator applied to her murder. We disagree.

The medical examiner, Dr. Chrostowski, testified that Heather Savannah was beaten severely and received multiple injuries while she was still alive, including: two broken femurs; a cut to her cheek so deep that it went down to the bone; scalping of her head; blunt impact trauma all around her face and head; contusions on her face, head, back, buttocks, and thighs; and scattered abrasions on top of her head, which indicated she was "impacted by objects on all sides." Contrary to Covington's statement to the detectives that the first thing he did to Heather Savannah was cut her throat, Dr. Chrostowski testified all of these injuries were inflicted prior to the fatal neck wound. Dr. Chrostowski was not able to discern the order in which the injuries occurred and could not say to a reasonable degree of medical certainty that Heather Savannah was conscious throughout the attack because the head injury Heather Savannah received would have been capable of rendering her unconscious. But Dr. Chrostowski also testified that

because the fractures to Heather Savannah's femurs were spiral fractures, which are "a hallmark of child abuse" that results from "jerking" a child, it was his opinion that the leg fractures and head trauma occurred when she was "grabbed by the legs and hit against something."

Covington admitted to the detectives that he "hurt" Heather Savannah "the most" of the three victims. Covington also discussed Heather Savannah's murder with a number of mental health professionals who testified at trial. Covington consistently reported to them that he was agitated and craving cocaine on the morning of the murders. He said he came out of the bedroom to use the phone in order to call a drug dealer to get more crack cocaine, and when he saw Heather Savannah on the couch playing with a cell phone, he became extremely enraged. Covington told Dr. Rao that he picked up Heather Savannah, threw her at the couch, and that she probably hit the wall when he threw her. Covington also told Dr. Rao that Heather Savannah was screaming.

We have explained that "the length of the victim's consciousness is not the only factor considered in assessing evidence supporting the HAC aggravator." Beasley v. State, 774 So. 2d 649, 669 (Fla. 2000); accord Hernandez v. State, 4 So. 3d 642, 669 (Fla. 2009). "The fear and emotional strain suffered by the victim can also be considered in determining whether the murder was heinous, atrocious, or cruel." Lott v. State, 695 So. 2d 1239, 1244 (Fla. 1997) (holding that although the

victim might not have been conscious at the time the fatal slash was inflicted, the HAC aggravator was supported by "the physical torture and emotional trauma she suffered during the time leading up to her death"); accord Gore v. State, 706 So. 2d 1328, 1335 (Fla. 1997) (upholding HAC aggravator even though victim's "death by gunshot was most likely instantaneous," because "the fear and emotional strain of the victim from the events preceding the killing may contribute to its heinous nature"); James v. State, 695 So. 2d 1229, 1235 (Fla. 1997) (observing that although "the HAC aggravator does not apply to most instantaneous deaths or to deaths that occur fairly quickly, fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel").  In determining whether the aggravator is present, the focus should be on the victim's perceptions of the circumstances, which may be evaluated in accordance with common-sense inferences from the circumstances.  See Hernandez, 4 So. 3d at 669.  But "the actions of the defendant preceding the actual killing are also relevant."  Id.

Here, there is competent, substantial evidence to support the trial court's finding of the HAC aggravator.  Even if, as Covington initially told detectives, the first thing he did to Heather Savannah was stand over her and saw at her neck with a bread knife while she cried, then clearly Heather Savannah was conscious and aware of her impending death, which would support the aggravator.  But the

- 28 -

evidence contradicts Covington's statement to detectives and supports an even more heinous, atrocious, and cruel version of events. Dr. Chrostowski testified that death would have occurred seconds after Heather Savannah received the fatal wound to her throat. It would not have been possible for Covington to have inflicted the litany of other antemortem injuries to Heather Savannah in the seconds between cutting her throat and her death; thus, the evidence establishes that those injuries were inflicted first.[7] And even if the first thing Covington did to Heather Savannah was pick her up by her legs and throw her into the wall and we assume that she was rendered unconsciousness on impact, she still would have been conscious prior to impact, she would have been terrified by the extreme rage Covington directed toward her and by being picked up by the legs and thrown into the wall, and she would have felt extreme pain as her thigh bones broke with the force of being jerked and thrown by Covington. Thus, regardless of whether Heather Savannah was conscious when Covington cut her throat, there is competent, substantial evidence to support the trial court's finding that her murder was HAC.

---

7. Although the fatal wound was a cut to the throat, because Heather Savannah was severely beaten before her throat was slashed, we also note that "[t]his Court has consistently upheld HAC in beating deaths." King v. State, 130 So. 3d 676, 684 (Fla. 2013) (quoting Douglas v. State, 878 So. 2d 1246, 1261 (Fla. 2004)); see, e.g., Dennis v. State, 817 So. 2d 741, 766 (Fla. 2002) (upholding HAC where both victims suffered skull fractures and were conscious for at least part of the attack).

## C. Sufficiency of the Sentencing Order

Covington raises several arguments relating to the sufficiency of the sentencing order. He first asserts that the sentencing order must be remanded to the trial court for reconsideration because it violates the edicts of Campbell v. State, 571 So. 2d 415 (Fla. 1990), receded from on other grounds by Trease v. State, 768 So. 2d 1050, 1055 (Fla. 2000). In Campbell, we articulated the requirements regarding the manner in which a trial court must weigh aggravating and mitigating circumstances in its written sentencing order. 571 So. 2d at 419-20. We have summarized the requirements for a capital sentencing order under Campbell and its progeny as follows:

> In Fennie v. State, 855 So. 2d 597, 608 (Fla. 2003), we reiterated the procedural requirements that a trial court must follow in its sentencing order in a capital case. A trial judge must
>
>> (1) expressly evaluate in his or her written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature; (2) assign a weight to each aggravating factor and mitigating factor properly established; (3) weigh the established aggravating circumstances against the established mitigating circumstances; and (4) provide a detailed explanation of the result of the weighing process.
>
> With regard to mitigating circumstances, "A trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent, substantial evidence to support the rejection." Moreover, in Trease v. State, 768 So. 2d 1050, 1055 (Fla. 2000), we receded from our decision in Campbell v. State, 571 So. 2d

415, 420 (Fla. 1990), and held that trial courts may assign no weight to a mitigating factor. In doing so, we recognized that a trial judge "may not preclude from consideration any evidence regarding a mitigating circumstance that is proffered by a defendant in order to receive a sentence of less than death." However, there are circumstances where although a mitigator may be relevant and must be considered by the trial judge because it is generally recognized as a mitigator, the judge "may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case."

Orme v. State, 25 So. 3d 536, 547-48 (Fla. 2009) (citations omitted). "[T]he determination of mitigating and aggravating circumstances and the respective weight assigned to each is within the trial court's discretion." Griffin v. State, 820 So. 2d 906, 913 (Fla. 2002).

Contrary to Covington's argument, we conclude that the trial court did in its sentencing order expressly evaluate each proposed mitigator, decide whether it was truly mitigating, assign a weight to each aggravator and mitigator, and weigh the aggravators against the mitigators. The trial court also sua sponte found that two additional mitigators were established. We therefore conclude that the sentencing order is sufficient to satisfy Campbell.

Covington raises other complaints about the sentencing order as well, which we view as merely an expression of his disagreement with the fact-finding properly conducted by the trial court. For example, he asserts that "technically, the court rejected the [capacity to conform conduct to the requirements of the law] mitigator" by finding only that Covington's capacity to conform his conduct to the

- 31 -

requirements of the law was only diminished rather than substantially impaired without providing a rational basis for rejecting the testimony of Covington's expert witnesses. This argument is without merit because the trial court was not required to accept the testimony of the defense experts, which was controverted and rebutted by the State's experts. The trial court accepted some of the testimony of the defense experts and rejected other testimony that was refuted by the State's experts. In doing so, the court properly executed its duty as the factfinder.

Covington also argues that the trial court's finding that his ability to conform his conduct to the requirements of the law was not substantially impaired due to his mental illness but was merely diminished due to his mental illness and his voluntary use of cocaine and alcohol "directly conflicts with, and cannot be 'squared' with, the conclusions of the defense experts." But again, in reaching this conclusion, the trial court was merely exercising its role as the factfinder by accepting parts of the testimony presented by the defense experts and rejecting other parts of that testimony based on other evidence in the record. In light of the other evidence in the record contradicting the testimony of the defense experts, the trial court had no obligation to "square" its conclusions with the testimony of the defense experts.

Finally, Covington argues that the trial court improperly accorded the extreme emotional or mental disturbance mitigator only moderate weight because

the trial court found that his disturbance was caused "by his voluntary use of cocaine, alcohol, and his voluntary discontinuing of his psychotropic medication because they caused him sexual dysfunction, knowing such would precipitate rage and violence." Covington asserts that it was improper for the trial court to consider the fact that Covington's intoxication was voluntary when evaluating this mitigator, but Covington offers no authority to support this argument. We cannot agree that the trial court abused its discretion in affording this circumstance moderate weight in light of its findings regarding the cause of the disturbance, which were supported by competent, substantial evidence.

### D. Parole Ineligibility as a Mitigating Circumstance

Covington asserts that the trial court erred in refusing to consider and weigh his proposed mitigating circumstance that "society can be protected and justice served by a sentence of life without parole." The trial court's sentencing order reveals that it did consider this proposed mitigator but concluded that it was "argument, not a mitigating factor" and declined to give it any weight.

We have previously determined that "[p]arole ineligibility is mitigating in nature because it relates to the circumstances of the offense and reasonably may serve as a basis for imposing a sentence less than death." Ford v. State, 802 So. 2d 1121, 1136 (Fla. 2001). Whether parole ineligibility is mitigating under the circumstances in a particular case is for the trial court to determine. Id. Here, the

State concedes that the trial court erred by not finding Covington's parole ineligibility to be mitigating in nature but argues that the error was harmless.

In Ford, we concluded that any error in the trial court's failure to find parole eligibility mitigating in nature was harmless for the following reasons: "(a) [this] factor[] occup[ies] a minor and tangential position in the present record; (b) the present case contains vast aggravation, including multiple execution-style murders; and (c) the trial court recognized and gave weight to numerous other mitigators." Id.; accord Tanzi v. State, 964 So. 2d 106, 120 (Fla. 2007) (concluding that any error in the trial court's failure to decide whether parole ineligibility was mitigating under the particular facts of the case was harmless beyond a reasonable doubt because: "(a) the trial court recognized and gave weight to numerous other mitigating circumstances; (b) this case involves substantial aggravation, including the HAC and CCP aggravating circumstances; and (c) the life without parole proposed mitigator is minor and tangential with respect to the record in this case"). We conclude that the trial court erred in failing to consider whether Covington's parole ineligibility was mitigating under the circumstances of this case, but, for the reasons that follow, we agree with the State that the error was harmless.

First, the trial court below recognized and gave weight to numerous other mitigating circumstances, including two statutory mitigators and twelve nonstatutory mitigators, eight of which were accorded at least moderate weight.

Second, this case involves substantial aggravation, including the fact that it was a brutal triple murder of an entire family, the murders of two of the victims were HAC, and two of the victims were defenseless young children. Finally, the life without parole proposed mitigator is minor and tangential with respect to the record in this case. This is true in light of the circumstances of this triple homicide, Covington's history of noncompliance with medication, and his history of self-medicating with alcohol and cocaine despite knowing that these drugs precipitate rage and violence from him. This mitigator is also minor in light of the fact that the trial court considered and weighed similar mitigators related to Covington's future risk for violence and ability to conform to incarceration.

Considering the substantial aggravation in this case and the other, similar mitigators that were found to be established and weighed, there is no reasonable possibility that the parole ineligibility mitigator would have affected the trial court's determinations that death is the appropriate sentence for each murder. Thus, any error in the trial court's failure to consider parole ineligibility as a mitigating circumstance was harmless beyond a reasonable doubt.

### E. Validity of the Guilty Pleas

Covington does not challenge the validity of his guilty pleas, but we are nonetheless required to review the judgment of conviction in all cases in which a sentence of death was imposed. § 921.141(5), Fla. Stat. (2016). In order to review

- 35 -

the judgment of conviction when a defendant has pleaded guilty to capital murder, we review the knowing, intelligent, and voluntary nature of the plea. Winkles v. State, 894 So. 2d 842, 847 (Fla. 2005); Lynch v. State, 841 So. 2d 362, 375 (Fla. 2003); see Koenig v. State, 597 So. 2d 256, 257 n.2 (Fla. 1992) (stating that in order to review the judgment of conviction when a defendant has pleaded guilty and been sentenced to death, this Court "must review the propriety of [the defendant's] plea, since it is the plea which formed the basis for his conviction"). "Proper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and ple[aded] guilty voluntarily." Ocha v. State, 826 So. 2d 956, 965 (Fla. 2002).

Before accepting Covington's guilty pleas, the trial court conducted a thorough plea colloquy with Covington during which the court informed him of all the rights he was waiving by pleading guilty. Covington indicated both orally and in writing that he understood the ramifications of his pleas, that although he was on psychiatric medications, there was nothing that would impair his understanding of his decision, and that he was not being threatened or coerced into entering the pleas. We have held that in a capital case where the trial court explained to the defendant that he "was entitled to a jury in both phases of the trial, that if he elected to waive his right to a jury, the judge alone would determine his sentence,

and that the only sentencing options were life or death" and the defendant "stated that he understood the ramifications of his plea, that he was not being threatened or coerced, and that he was not on any medication that would impair his understanding of his decision," the defendant "knowingly and voluntarily entered his plea, and the trial court properly accepted it." Winkles, 894 So. 2d at 847. We therefore conclude that Covington's pleas were knowingly, intelligently, and voluntarily entered.

## F. Proportionality

To ensure uniformity of sentencing in death penalty proceedings, this Court considers the totality of circumstances and compares each case with other capital cases. We do not simply compare the number of aggravating and mitigating circumstances. Taylor v. State, 937 So. 2d 590, 601 (Fla. 2006). "Further, in a proportionality analysis, this Court will accept the weight assigned by the trial court to the aggravating and mitigating factors." Hayward v. State, 24 So. 3d 17, 46 (Fla. 2009). "In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders." Urbin v. State, 714 So. 2d 411, 416 (Fla. 1998).

Here, the trial court found that three aggravating circumstances for Lisa's murder (including HAC and prior violent felony), four aggravating circumstances

for Zachary's murder (including prior violent felony), and five aggravating circumstances for Heather Savannah's murder (including HAC and prior violent felony) were proven beyond a reasonable doubt. HAC and prior violent felony are among the weightiest of the aggravators. Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010). The trial court accorded moderate weight to the two statutory mitigating circumstances that were established—extreme mental or emotional disturbance and no significant criminal history—and found that twenty-four nonstatutory mitigating circumstances were established but accorded only one of them great weight and twelve of them no weight.

We have found the death penalty to be proportionate in other similar cases. In Aguirre-Jarquin, 9 So. 3d at 610, the death sentences were affirmed where the defendant stabbed to death a mother and daughter who were his neighbors and with whom he visited socially. The defendant was drinking and using cocaine prior to the murders. 9 So. 3d at 599-600, 600 n.4. Three aggravators were found as to the mother's murder: prior violent felony, engaged in the commission of a burglary, and HAC. Id. at 600 n.6. Five aggravators were found as to the daughter's murder: prior violent felony, engaged in the commission of a burglary, avoid arrest, HAC, victim particularly vulnerable due to age or disability. Id. And the mitigation in Aguirre-Jarquin was similar to the mitigation here, including extreme mental or emotional disturbance (moderate weight), substantially impaired ability

to appreciate the criminality of his conduct (moderate weight), and long term substance abuse (moderate weight).  Id.  We concluded that Aguirre-Jarquin's death sentences were proportionate compared to other death sentences we have upheld based on the evidence set forth at trial, the aggravators, and the totality of the circumstances.  Id. at 610; see also Smithers v. State, 826 So. 2d 916 (Fla. 2002) (upholding both death sentences in double murder where there were three aggravators found for one murder and two for the other (HAC and prior violent felony for contemporaneous murder found for both) and where there were two statutory mitigators as well as seven nonstatutory mitigators); Francis v. State, 808 So. 2d 110 (Fla. 2001) (upholding death penalty for both stabbing murders of elderly sisters when trial court found four aggravators for each murder (HAC, victims vulnerable due to age, prior violent felony for contemporaneous murder, and murders committed during the course of a robbery) and two statutory mitigators along with six nonstatutory mitigators); Morton v. State, 789 So. 2d 324 (Fla. 2001) (upholding both death sentences in double murder by gunshot and stabbing where trial court found three aggravators with respect to one murder and five with respect to the other (prior violent felony for contemporaneous murder and CCP found for both) and found two statutory mitigators and five nonstatutory mitigators).

In light of the presence of two of the weightiest aggravators as to the murders of Lisa and Heather Savannah and one of the weightiest aggravators as to Zachary's murder, only two statutory mitigators of moderate weight, and the fact that only twelve nonstatutory mitigators were accorded any weight with eleven of them being relatively weak, we conclude that the death sentences are proportionate.

## G. Hurst

Covington asserts that he is entitled to relief under Hurst v. Florida, 136 S. Ct. 616 (2016). We disagree. A defendant like Covington who has waived the right to a penalty phase jury is not entitled to relief under Hurst. See Mullens v. State, 197 So. 3d 16, 40 (Fla. 2016) (concluding that defendant who waived penalty phase jury was not entitled to relief under Hurst because a defendant "cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence"), cert. denied, 137 S. Ct. 672 (2017); see also Brant v. State, 197 So. 3d 1051, 1079 (Fla. 2016) (relying on Mullens to deny Hurst relief in a postconviction context where the defendant waived a penalty phase jury).

## III. CONCLUSION

Having reviewed Covington's claims as well as the sufficiency of his pleas, we affirm the judgments of conviction and sentences of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Hillsborough County,
     William Fuente, Judge - Case No. 292008CF009312000AHC

Howard L. "Rex" Dimmig, II, Public Defender, and Cynthia J. Dodge, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and C. Suzanne Bechard, Assistant Attorney General, Tampa, Florida,

     for Appellee