# Supreme Court of Florida

————————

No. SC18-973

————————

**WAYNE C. DOTY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

February 13, 2020

PER CURIAM.

In this direct appeal of Wayne C. Doty's second sentencing proceeding, Doty argues that the trial court erred in giving a jury instruction that did not require the determinations referred to in section 921.141(2)(b)2., Florida Statutes (2018), to be proved beyond a reasonable doubt. Doty also argues that the trial court erred by denying his request to include a nonbinding sentencing recommendation in the sentencing order. In addition to addressing Doty's claims, we have an independent obligation to determine if the sentence of death is proportionate. *Hampton v. State*, 103 So. 3d 98, 120 (Fla. 2012). We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Doty's death sentence.

# FACTS AND PROCEDURAL BACKGROUND

Doty was convicted and sentenced to death for the murder of Xavier Rodriguez, a fellow prison inmate; we affirmed Doty's conviction and sentence on direct appeal. *Doty v. State*, 170 So. 3d 731, 734 (Fla. 2015). However, because the jury did not unanimously recommend death, the trial court later vacated Doty's sentence pursuant to *Hurst v. State*, 202 So. 3d 40 (Fla. 2016). At the conclusion of Doty's second sentencing proceeding, the jury voted unanimously for the death sentence. The facts of the murder were set forth in our decision on Doty's first direct appeal.

> The evidence showed that Doty was, at the time of the murder, serving a life sentence for the shooting death of his former employer. Doty was transferred to Florida State Prison (FSP) and was assigned to the "K wing," working as a runner. Each wing at the prison had four runners, who worked in pairs and assisted in numerous duties, including distributing meals to the other prisoners and cleaning common areas. In return, the runners were given certain privileges. Doty's partner as a runner was [William] Wells, who assisted in the murder of Rodriguez, another runner on the K wing.

> Doty began planning the murder after the victim, Rodriguez, called Doty names and stole some tobacco from Doty approximately two weeks prior to the incident. In exchange for tobacco, Doty convinced another inmate to make him a knife that he could use to murder Rodriguez. On the evening of May 17, 2011, Doty obtained the homemade knife, which was hidden in a newspaper, when he assisted in picking up inmate food trays after dinner. Doty deposited the knife into a trashcan, which he later retrieved and brought to the third-floor interview room that the runners were permitted to use. Doty then placed the weapon in the duct work there so he could easily retrieve it.

That evening, Doty and Wells carefully watched when the officers made their rounds to determine the best time to kill Rodriguez. After convincing Rodriguez to meet them in the third-floor interview room, Doty and Wells tricked Rodriguez into letting them bind his hands by betting him some tobacco that he could not get out of "Coast Guard handcuffs." After his hands were bound, Doty approached Rodriguez from behind and placed him in a rear chokehold. At first, Rodriguez thought it was a joke but, as Doty explained in his confession, "Once I really got that chokehold locked down, he knew the game was over." After Doty felt Rodriguez "go slack," Doty let Rodriguez's body drop to the floor, and Doty later commented that the body made a "hollow thud" as it hit the floor.

Wells ensured that nobody else entered the room, while Doty pulled the body around the desk and began to stab Rodriguez with the homemade knife. Although Doty admitted that he was hoping to pull out Rodriguez's heart "to make sure he was really dead," the knife was too dull and did not work for that task. Doty and Wells then tied a ligature around Rodriguez's neck, smoked a cigarette, took showers, and, after they were sure that Rodriguez was really dead, called a sergeant working at the prison and confessed to the crime.

*Doty*, 170 So. 3d at 734.

At the sentencing proceeding held after Doty's initial sentence was vacated, the State attempted to prove three aggravating factors. First, that Doty was currently serving a sentence of imprisonment for a prior felony conviction. *See* § 921.141(6)(a), Fla. Stat. Second, that Doty was previously convicted of a capital felony. *See* § 921.141(6)(b). Third, that Doty murdered Rodriguez in a cold, calculated, and premeditated manner without pretense of moral or legal justification. *See* § 921.141(6)(i). As to the first two aggravators, the State and Doty stipulated that Doty had been convicted of first-degree murder for killing his

- 3 -

former employer, and that he was imprisoned at Florida State Prison when Rodriguez was killed. As to the third aggravator, two prison employees testified that Doty confessed to them that he had been planning Rodriguez's murder for weeks. According to the State, their testimony demonstrated that Doty acted in a cold, calculated, and premeditated manner. The State also read victim impact testimony in the form of testimony given by the victim's mother at the first trial.

Doty called several witnesses to establish nonstatutory mitigating factors. The witnesses spoke of Doty's experiences in prison, his cooperation with the investigation, his mental health issues, and his troubled upbringing. A fellow inmate testified about the importance of respect in prison, stating that violent behavior is accepted and that murder can be a survival mechanism. He said that Doty was respectful and never manipulated other inmates. A correctional officer testified that Doty was a "good worker" who took responsibility for Rodriguez's murder, helped authorities resolve the case, and even offered suggestions to improve their security measures. Dr. Harry Krop, a psychologist, testified that he diagnosed Doty with obsessive compulsive personality disorder, and he described Doty's adverse childhood experiences—specifically, that Doty was neglected and abandoned, lacked a male role model, and was subjected to domestic violence.

Doty's mother testified that Doty's father took Doty and left when Doty was just two years old. Doty's former stepmother testified that Doty's father had

abused her in front of Doty, and she admitted to burning Doty's fingers on the stove to punish him. Another of Doty's stepmothers testified that Doty's father once abused her so severely she could not work for a week, and she testified that she witnessed Doty's father physically abuse Doty as well. She testified that Doty began writing illegal checks and stealing cars at thirteen years old. She said that after her relationship with Doty's father ended, she kept in touch with Doty and continued to support him until he murdered his employer. Doty's father testified that Doty's half-brother was struck and killed by a semi-truck a few months before Doty killed his employer. Doty's father admitted that he moved Doty "from mother to mother" and that he exposed Doty to severe physical violence against women.

At the final charging conference, the trial court reviewed the proposed jury instructions with Doty (who was representing himself). Those instructions provided that a death sentence could be imposed only if the jury unanimously found that the State had proved at least one aggravating factor beyond a reasonable doubt, that the aggravating factors found to exist were sufficient to justify the death penalty, that the aggravating factors outweighed any mitigating circumstances found to exist, and that, based on all these considerations, the defendant should be sentenced to death. Doty made no objections and told the court that he was satisfied with the proposed instructions.

The jury unanimously found that the State proved all three aggravating factors beyond a reasonable doubt, and that Doty established four nonstatutory mitigating circumstances by the greater weight of the evidence. The jury unanimously agreed that the aggravators outweighed the mitigators and unanimously recommended death. The trial court entered a sentencing order, finding that the State proved all three aggravators beyond a reasonable doubt. Although the jury had found that Doty proved only four nonstatutory mitigators, the trial court weighed the three proven aggravators against all seven of Doty's alleged mitigators. After considering and weighing the aggravators and mitigators, the trial court sentenced Doty to death.

Doty filed a motion asking the trial court to add a no-contact provision to the sentencing order, based on alleged confrontations with an assistant warden. The Department of Corrections objected, arguing that the trial court had no jurisdiction to order the Department to administratively process an inmate in any specific manner. The Department conceded, however, that the trial court could make a nonbinding recommendation if it wished to. The trial court denied Doty's motion, determining that the court lacked authority to regulate the placement of prison inmates. The court declined to write a nonbinding recommendation, stating it had no reason to believe that prison officials would follow a court's nonbinding recommendation.

**ANALYSIS**

*I.    Jury Instructions*

Doty first argues that the trial court erred by failing to instruct the jury that it must find *beyond a reasonable doubt* that the aggravating factors were sufficient to warrant a death sentence and that they outweighed the mitigating factors. However, these determinations are not subject to the beyond a reasonable doubt standard of proof.  *Newberry v. State*, 44 Fla. L. Weekly S287 (Fla. Dec. 12, 2019); *Rogers v. State*, 285 So. 3d 872 (Fla. 2019).  We therefore conclude that the trial court did not err in failing to so instruct the jury.

*II.    Sentencing Recommendation*

Next, Doty challenges the trial court's rejection of his request for a nonbinding recommendation to the Department of Corrections.  Doty does not contest that the trial court lacked jurisdiction to enter a no-contact order or a binding order requiring Doty to be transferred.

Doty cites three cases for the proposition that resentencing is required when a trial court fails to exercise its discretion based on an erroneous view of the law, but all three cases are inapplicable.  In *Patterson v. State*, 206 So. 3d 64, 65-66 (Fla. 4th DCA 2016), the trial court could have imposed a concurrent sentence but mistakenly believed it had no discretion in sentencing.  Similarly, in *Goldwire v. State*, 73 So. 3d 844, 845 (Fla. 4th DCA 2011), the trial court "believed that because Goldwire's youthful offender VOP was based on substantive charges, it no

longer had discretion for sentence imposition and was required to use the Criminal Punishment Code guidelines for sentencing"; on appeal, however, the Fourth District held that a trial court "is not required to impose the minimum mandatory sentence, but instead, is able to do so when exercising its discretion, dependent upon the circumstances of the case." *Id.* at 846. And in *Doe v. State*, 499 So. 2d 13, 14 (Fla. 3d DCA 1986), "the trial judge labored under the mistaken impression that he was not free to reduce defendant's sentence beyond that recommended by the state . . . , erroneously believing that the statute prohibited further reduction."

Unlike the trial courts in *Patterson*, *Goldwire*, and *Doe*, the court here did not deny Doty's request under any "erroneous belief" or mistaken impression of the law as to the scope of its discretion. The court acknowledged that it had the authority to write the requested nonbinding recommendation, but the court chose not to because it had "no reason to believe that Florida State Prison officials would follow a nonbinding recommendation as to [Doty's] placement."

Doty also insists that the trial court did not consider the evidence pertaining to his request, but the trial court specifically stated in its order that it considered Doty's "motion, the Department's response, [Doty's] legal arguments during the pretrial hearing, and the record." The trial court enumerated Doty's allegations against the prison and the assistant warden. Because the trial court adequately

considered Doty's request and did not act under any mistaken impression of the law, we deny this claim.

### III. Proportionality

Although Doty did not raise proportionality in his briefs, we have an independent obligation to review death sentences for proportionality regardless of whether the issue was raised on appeal. *Damas v. State*, 260 So. 3d 200, 216 (Fla. 2018); *see* Fla. R. App. P. 9.142(a)(5). In doing so, we conduct a "comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." *Silvia v. State*, 60 So. 3d 959, 973 (Fla. 2011) (quoting *Anderson v. State*, 841 So. 2d 390, 407-08 (Fla. 2003)). We consider the totality of the circumstances and compare the case with other capital cases. *Covington v. State*, 228 So. 3d 49, 68 (Fla. 2017). We do not ask if the aggravators *outnumbered* the mitigators, *Lowe v. State*, 259 So. 3d 23, 66 (Fla. 2018), but instead undertake "a thoughtful and deliberate "*qualitative* review . . . of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." *Gill v. State*, 14 So. 3d 946, 964 (Fla. 2009) (quoting *Urbin v. State*, 714 So. 2d 411, 416 (Fla. 1998)). We also "accept the weight assigned by the trial court to the aggravating and mitigating factors." *Covington*, 228 So. 3d at 68 (quoting *Hayward v. State*, 24 So. 3d 17, 46 (Fla. 2009)).

In Doty's first direct appeal, we found that his death sentence was proportionate in comparison to other capital cases, reasoning as follows:

> Comparing the death sentence in this case to other capital cases, we recognize that this case is exceedingly similar to the facts and circumstances of [*Gill*], a case in which the defendant was convicted of murder after he strangled his cellmate. Similar to this case, Gill had planned to kill an inmate for a substantial time before he killed his cellmate, and then, after the murder, cooperated with authorities and admitted to the murder. Gill killed his cellmate for the purpose of obtaining the death penalty and had previously warned numerous people that he had no intention of spending the rest of his life in prison and would kill again in order achieve this goal. That case involves the same three aggravators that were found in this case: (1) Gill was under a life sentence for a prior murder at the time he murdered his cellmate; (2) Gill had previously been convicted of another capital felony, i.e., the prior murder; and (3) the killing was CCP. Further, Gill presented significant mitigation, including an uncontested mental illness he had since childhood. This Court found that the sentence of death was proportional.
>
> Accordingly, we hold that the sentence of death is proportional to other cases in which the sentence of death was upheld.

*Doty*, 170 So. 3d at 745 (citations omitted). Because the aggravators and mitigators presented at Doty's second sentencing proceeding were identical to the aggravators and mitigators in his first penalty phase proceeding, we see no reason to depart from our previous proportionality analysis.

## CONCLUSION

Having reviewed Doty's claims and having assessed the proportionality of his sentence, we affirm Doty's sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, and MUÑIZ, JJ., concur.
LABARGA, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in part and dissenting in part.

I concur with the decision of the majority to affirm Doty's sentence of death. However, for the reasons expressed in my concurring in part, dissenting in part opinion in *Rogers v. State*, 285 So. 3d 872 (Fla. 2019), I dissent from the majority's use of the term "determinations" to refer to findings mandated by this Court's decision in *Hurst v. State*, 202 So. 3d 40 (2016). As I explained in *Rogers*:

> Although Florida's sentencing statutes have changed since the issuance of *Hurst*, the title of section 921.141(2), Florida Statutes (2018), is "Findings and recommended sentence by the jury," and that subsection lists precisely what we held in *Hurst* to be the "critical findings" that must be found unanimously by a jury before a sentence of death may be recommended . . . . A finding does not suddenly cease to be a finding simply because the statute has been reworded to remove certain references to "findings" and add the word "determine."

44 Fla. L. Weekly at S216.

An Appeal from the Circuit Court in and for Bradford County,
   William E. Davis, Judge - Case No. 042011CF000498CFAXMX

Andy Thomas, Public Defender, and Barbara J. Busharis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

   for Appellant

Ashley B. Moody, Attorney General, and Jennifer A. Donahue, Assistant Attorney General, Tallahassee, Florida,

for Appellee