# Supreme Court of Florida

---

No. SC21-295

---

**EDWARD ALLEN COVINGTON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

---

No. SC21-1077

---

**EDWARD ALLEN COVINGTON,**
Petitioner,

vs.

**RICKY D. DIXON, etc.,**
Respondents.

August 25, 2022

PER CURIAM.

Edward Allen Covington appeals an order denying his motion to vacate his convictions and sentences—including three convictions for first-degree murder and three sentences of death—

filed under Florida Rule of Criminal Procedure 3.851, and petitions

this Court for a writ of habeas corpus. We have jurisdiction. *See*

art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below,

we affirm the denial of postconviction relief and deny Covington's

habeas petition.

## I. BACKGROUND

In 2014, Covington pleaded guilty to murdering his girlfriend

and her two children, mutilating their bodies, and beating their dog

to death with a hammer. He waived a jury for the penalty phase

and was sentenced to death. On direct appeal, this Court set forth

the facts of the murders as follows:

> In May 2008, Lisa Freiberg lived in Lutz, Florida, with her two children, seven-year-old Zachary and two-year-old Heather Savannah, and her boyfriend, Edward Allen Covington. Covington met Lisa through an online dating site and moved into her home in April 2008. On May 11, 2008, Covington murdered Lisa, Zachary, and Heather Savannah. He also killed the family dog, Duke.
>
>  . . . .
>
>  . . . On Monday, May 12, 2008, when Lisa did not drop the children off at the babysitter's house as expected, Barbara [Lisa's mother] and her husband drove over to Lisa's house to check on her. When Barbara opened the door and looked into the house, she saw Zachary's deceased, nude body and called 911.

Law enforcement responded to the scene and found the home in complete disarray. The furniture was turned over and there was blood on the floors, walls, and surfaces in every room except the bathroom. In addition to Zachary's body, they found the bodies of Heather Savannah, Lisa, and the dead dog at various locations throughout the house. Heather Savannah had been dismembered and decapitated. Zachary's genitals had been mutilated. Lisa's body was in the doorway of the master bedroom, with a bloody handprint on the wall nearby. The dog's body was on the floor in Heather Savannah's bedroom. Two hammers and five knives that appeared to have been used in the murders were found and collected. A mesh bag containing bloody clothing was found under the mattress in the master bedroom.

Law enforcement found Covington in a closet in one of the bedrooms. He indicated that he had taken a number of pills. Depakote and Seroquel pills prescribed to Covington were found in the house. Covington was medically cleared by paramedics at the scene but transported to the hospital for further diagnosis and clearance. As he was being transported to the hospital, Covington looked back and stated, "I can't believe what I've done." After Covington was released from the hospital on May 14, 2008, he was transported to the Sheriff's Office, where he was interviewed by detectives and confessed to the murders.

. . . .

Covington's May 14, 2008, interview with detectives was played at the penalty phase. In the interview, Covington said that he met Lisa through an online dating site in August 2007, and they hit it off. He said that he had been living with Lisa on and off but officially started living with her a couple of weeks before the murders and everything was going great. He said Lisa and the children loved him. He talked about the days leading up to the murders. He said that he and Lisa were having

- 3 -

problems potty-training Heather Savannah and that she had not been eating properly. He knew that Barbara had seen marks on Heather Savannah and that she thought he was abusing the children. Barbara told Lisa that she did not want Lisa to take the children back home while Covington was there. Covington denied abusing the children and said it "really, really ticked [him] off" that Barbara thought he was. He admitted that he had hit Heather Savannah on the leg when she picked up a cell phone a couple of days before the murders but said he did not mean to hit her hard. He also admitted that the marks could have occurred when he spanked Heather Savannah, but he said he did not realize he spanked her that hard.

Covington said that Lisa picked up the children from Barbara's on Saturday afternoon, the day before the murders. Covington prepared lunch for the children and dinner for the four of them. They ate dinner around 6 p.m. and then took the children to visit with [Heather Savannah's father's] family. While the children and Lisa were visiting, Covington said he needed to go check his mailbox and left, but he actually went to buy and smoke crack cocaine.

According to Covington, when they got home around 9:30 p.m. or 10 p.m., the children went to bed, and Covington and Lisa had a drink together and had sex. Covington then played a computer game. He and Lisa went to bed around midnight or 1 a.m. Before bed, Covington said he "took a handful of Seroquel" because he was "dog tired" and it had not been as effective recently. He said he took roughly 1,000 milligrams of Seroquel (including four 200-milligram, extended release pills), which he described as "a hundred [milligrams] over the max[imum] safe dose." Covington said when the Seroquel works properly, "it's like turning off a light switch. . . . [A]ll the extra thought . . . shuts off, everything goes quiet." The extended release Seroquel

was new to Covington and he said the first time he took one 200-milligram pill, the effects lasted twenty-six hours. Covington said that Lisa fell asleep in his arms. Covington initially told the detectives that he did not know what happened next, but he then admitted that he "kind of" remembered what happened the next morning and described what he said he remembered about the murders.

Covington said that Lisa and Zachary were still in bed around 10:30 Sunday morning when he found Heather Savannah awake and lying on the couch in the living room. Covington asked Heather Savannah "what she was doing up and she just started to cry." He said "that is the last recollection of being in control I know of" and the next thing he remembered was all the chaos and killing. He said that he killed Heather Savannah first, that he "hurt her the most," and that he "cut her in half" with a bread knife. He said the first thing he did was cut Heather Savannah's throat, "the jugular," while she was lying on the couch and he was standing over her. He used four back-and-forth motions. He said he then "literally ripped Savannah in half," "almost like carving a pig." He said he had to get her undressed in order to cut her in half. He believed she was dead at that time but could not be sure. He also decapitated Heather Savannah and set her head by the front door. Although he initially said Heather Savannah was crying, he later said she never yelled or cried. He specifically remembered that the bread knife he used on Heather Savannah was bent in the process. When asked about a bite mark on Heather Savannah's arm, he said he may have left that the night before, because she was biting Zachary and in order to "break[ ] her on that[,] . . . we would bite her back."

After he killed Heather Savannah, Covington remembered choking and strangling Lisa. He said he did not remember punching her but thought he might have

- 5 -

because he remembered her having a bloody face. He said he used a two-and-a-half-inch-wide butcher knife and an upward motion to stab her in the chest, which he believed "probably perforated the heart and the lung."

Zachary was still asleep in his top bunk when Covington stabbed him. Zachary did not say anything during the stabbing, and Covington thought that was because he stabbed Zachary's heart. He thought he stabbed Zachary three times, once in the back and twice in the chest cavity. He remembered a "chopping knife" breaking off inside Zachary when it hit bone. Covington then brought Zachary to the living room and removed his scrotum and penis. He said that the mutilation did not have a sexual basis and that he used pliers to touch Zachary's penis.

Covington killed Duke last, by punching him and hitting him with a hammer.

Covington said that after Lisa was dead, he kept hearing her voice, so he cut her again. Then he "got what [he] could find of Savannah and Zachary and put 'em over by the front door." He remembered calling his ex-wife, Cheri, twice, but she did not answer, and he thought he may have left a message the second time he called.

Covington said that at some point he thought this must be a nightmare and that he better take some more Seroquel. He thought it was at that time that he took Depakote, aspirin, Tylenol, and caffeine. He vaguely remembered falling down in the closet while he was looking for clothes. The next thing he remembered was the police officers telling him to get out of the closet. He did not know how long he had been in the closet but remembered that it was daylight when he went in.

- 6 -

*Covington v. State*, 228 So. 3d 49, 52-56 (Fla. 2017) (footnote

omitted) (alterations in original), *cert. denied*, 138 S. Ct 1294

(2018).

The medical examiner testified that Lisa was beaten and

stabbed. *Id.* at 56. The fatal wound was a large gaping wound to

her neck, which appeared to have been made by a back-and-forth

sawing motion with a knife. *Id.* Her skull was fractured and

fragmented in a manner consistent with blows from the smaller

hammer found at the scene. *Id.* After her death, she was stabbed

in her abdomen and pubic region. *Id.* Heather Savannah died as a

result of her neck being cut. "Prior to the infliction of the fatal

wound, Heather Savannah was severely beaten—her cheek was cut

down to the bone, the top of her head was cut with a knife in a

scalping motion, and both of her femurs were fractured." *Id.*

Postmortem, "[s]he was decapitated and her torso was cut from the

genital region through the chest. Her right leg and hip were entirely

removed from the body." *Id.* "Zachary died as a result of five stab

wounds to his neck and back . . . ." *Id.* "Prior to his death,

Zachary's skull was fractured in a manner consistent with [having

been caused by] blows from the larger hammer found at the scene."

*Id.* at 56-57. "A large, gaping wound to the front of Zachary's body, which exposed some of his internal organs, was inflicted perimortem. After Zachary was dead, his genitals were removed, additional stab wounds were inflicted to his chest and back, and decapitation was attempted." *Id.* at 57.

At the penalty phase, Covington presented mitigation mainly through his parents and several experts, including Dr. Daniel Buffington, a clinical pharmacologist; Dr. Alfonso Saa, a psychiatrist; Dr. Valerie McClain, a psychologist; Dr. Harry Krop, a psychologist; and Dr. Bala Rao, a psychiatrist.

The evidence presented in mitigation established that when Covington was a newborn in 1972, he was given a massive overdose of an antibiotic, which caused him to permanently lose thirty percent of his hearing. The hearing loss was especially upsetting to Covington because it prevented him from becoming a Navy pilot. But Covington received a settlement from the hospital and used the money to hire a private flight instructor and obtain a pilot's license at the age of seventeen. Covington was a good student and did not get into trouble in school. He was employed with the Florida Department of Corrections (DOC) from 1996 to 2006.

Covington has a long history of mental health issues and substance abuse beginning at age fifteen, when he was first hospitalized for mental health treatment, diagnosed with a "chemical imbalance," and prescribed medication. He was later diagnosed with bipolar disorder and hospitalized on a number of occasions over the years. Covington was not always compliant in taking his prescribed medications and would self-medicate with drugs and alcohol. While working for the DOC,

Covington was abusing cocaine and opiates. Covington stopped working for the DOC because he was getting very paranoid due to his cocaine use. Covington described cocaine to Dr. Krop as "like a mistress, like a siren calling to me." Covington told Dr. Krop that he spent $200-250 per week on cocaine during the same time period in which he complained that his psychiatric medications were financially unavailable to him. Covington admitted that he was aware for years prior to the murders that every time he used alcohol and cocaine it triggered a rage reaction in him and could cause him to lose control, but he drank almost a half-liter of alcohol and used crack cocaine the night before the murders anyway.

*Id.*

The trial court found multiple aggravating circumstances were proven beyond a reasonable doubt as to each murder. *Id.* at 60.[1]

---

1. This court summarized the trial court's sentencing findings as follows:

> As to the murder of Lisa Freiberg, the trial court concluded that three aggravating circumstances were proven beyond a reasonable doubt: (1) the capital felony was especially heinous, atrocious, or cruel (great weight); (2) Covington was previously convicted of another capital felony or of a felony involving the use or threat of violence (great weight); and (3) the capital felony was committed while Covington was on felony probation (minimal weight).
>
> As to the murder of Zachary Freiberg, the trial court concluded that four aggravating circumstances were proven beyond a reasonable doubt: (1) Covington was previously convicted of another capital felony or of a felony involving the use or threat of violence (great weight); (2) the victim of the capital felony was a person

It found that two statutory mitigating circumstances were established—"the capital felony was committed while Covington was under the influence of extreme mental or emotional disturbance (moderate weight)," and "Covington has no significant history of prior criminal activity (moderate weight)"—and twenty-four nonstatutory mitigating circumstances were established, including that "Covington suffers from bipolar disorder, intermittent explosive

---

less than twelve years of age (great weight); (3) the capital felony was committed while Covington was on felony probation (minimal weight); and (4) the victim of the capital felony was particularly vulnerable because Covington stood in a position of familial or custodial authority over the victim (great weight).

As to the murder of Heather Savannah Freiberg, the trial court concluded that five aggravating circumstances were proven beyond a reasonable doubt: (1) the capital felony was especially heinous, atrocious, or cruel (great weight); (2) Covington was previously convicted of another capital felony or of a felony involving the use or threat of violence (great weight); (3) the victim of the capital felony was a person less than twelve years of age (great weight); (4) the capital felony was committed while Covington was on felony probation (minimal weight); and (5) the victim of the capital felony was particularly vulnerable because Covington stood in a position of familial or custodial authority over the victim (great weight).

*Covington*, 228 So. 3d at 60.

- 10 -

disorder, and cocaine and alcohol abuse disorder (great weight)," and that "Covington's capacity to conform his conduct to the requirements of the law was diminished due to his mental illness and his voluntary use of cocaine and alcohol (moderate weight)." *Id.* (footnotes omitted). The trial court sentenced Covington to death for each murder as well as concurrent sentences of fifteen years for each of the three counts of mutilation of a dead body and five years for cruelty to an animal. *Id.* at 61. We affirmed the convictions and sentences on direct appeal. *Id.* at 69.

## II. POSTCONVICTION APPEAL

In 2019, Covington filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851, followed by several amendments thereto. After holding an evidentiary hearing on a number of claims over five days in December 2019 and September 2020, the trial court denied relief. This appeal follows.

### A. Evolving Standards of Decency

Covington first asserts that the trial court erred in summarily denying his claim that evolving standards of decency prohibit his death sentence because of his severe mental illness. He claims to raise the issue on appeal "to preserve this specific subclaim should

current or future law or cases require a claim of incompetency at time of execution be raised at this stage of postconviction proceedings." Initial Br. of Appellant at 6.

In denying this claim, the trial court found that it was "procedurally barred and has been previously rejected on the merits by the Florida Supreme Court." Because this Court has repeatedly concluded that there is no categorial bar on execution of the mentally ill and because this claim should have been raised on direct appeal, *see Carroll v. State*, 114 So. 3d 883, 886-87 (Fla. 2013), there was no error in denying this claim.

## B. Ineffective Assistance of Counsel During the Penalty Phase

Covington contends that the trial court erred in denying a number of his claims of ineffective assistance of trial counsel.

Under *Strickland v. Washington*, 466 U.S. 668, 686-88 (1984), a defendant alleging that he or she received ineffective assistance of counsel has the burden to demonstrate counsel's performance fell below an objective standard of reasonableness. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.* at 687. As

to the first prong, the defendant must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Generally, a court reviewing the second prong must determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"Where the defendant claims counsel rendered ineffective assistance in the penalty phase, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " *Hayward v. State*, 183 So. 3d 286, 297 (Fla. 2015) (quoting *Strickland*, 466 U.S. at 695).

> However, *Strickland* cautions that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

*Hayward*, 183 So. 3d at 297. "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### 1. Insanity as Mitigation

Covington first argues that the postconviction court erred in denying his claim that counsel was ineffective for failing to present evidence at the penalty phase that he was insane at the time he committed the murders.

At trial, Covington was represented primarily by Julianne Holt, the elected Public Defender for the Thirteenth Judicial Circuit, Theda James, and Michael Peacock, all of whom are very experienced death-qualified defense attorneys. James was lead counsel for the penalty phase.

During the penalty phase, James elicited testimony from three mental health experts—Dr. McClain, Dr. Krop, and Dr. Rao—that Covington suffers from bipolar disorder and that he qualified for

- 14 -

both mental health statutory mitigators. *Covington*, 228 So. 3d at 58; *see* § 921.141(6)(b), Fla. Stat. (2014) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance."); § 921.141(6)(f), Fla. Stat. (2014) ("The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired."). The trial court found that Covington had established the statutory mitigator that the capital felony was committed while he was under the influence of extreme mental or emotional disturbance. *Covington*, 228 So. 3d at 60. And although the court did not find that Covington's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was "substantially impaired" so as to qualify for the other statutory mental health mitigator, it did find, as a nonstatutory mitigator, that his capacity to conform his conduct to the requirements of the law was "diminished" due to his mental illness and his voluntary use of cocaine and alcohol. *Id.* Both of those mitigators were given moderate weight. *Id.*

Covington asserts that Dr. McClain would have testified at the penalty phase that Covington was insane at the time of the murders

had counsel asked, and as a result, "the judge would have given greater weight to the following mitigating factors: extreme mental or emotional disturbance; the capacity of Covington to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired at the time of offense";[2] and the nonstatutory mitigators. Initial Br. of Appellant at 32. At the evidentiary hearing, Covington presented testimony from two experts retained by Covington in postconviction, Drs. Mark Cunningham and Frank Wood, who opined that Covington was insane at the time of the murders.

James testified at the evidentiary hearing that out of the seventeen doctors she consulted with before the trial, Dr. McClain was the only one who was of the opinion that Covington was insane at the time of the murders. James was concerned that if she elicited testimony from Dr. McClain that Covington was insane at the time of the murders, that would open the door for the State to elicit the opinions of other defense experts, namely, Drs. Krop and

---

2. Because this mitigator was not found by the trial court, Covington presumably meant that the court would have found it to be established rather than giving it greater weight.

Rao, as well as the opinions of State experts, Drs. Myers and Lazarou, that Covington was not insane at the time of the murders. James also testified that all the underlying factors that led Dr. McClain to her opinion that Covington was insane at the time of the murders were presented at the penalty phase in support of the two statutory mental health mitigators.

We agree with the postconviction court that counsel's performance was not rendered deficient by her failure to ask Dr. McClain for her opinion on insanity in light of the fact that counsel elicited all of the underlying factors that led Dr. McClain to her opinion and that asking the question directly would have opened the door to testimony refuting her opinion from a minimum of four experts. And even though postconviction counsel was able to find two more experts who were willing to testify in the postconviction proceedings that Covington was insane at the time of the murders, "[t]rial counsel is not deficient because the defendant is able to find postconviction mental health experts that reach different and more favorable conclusions than the mental health experts consulted by trial counsel." *Diaz v. State*, 132 So. 3d 93, 113 (Fla. 2013); *see Wyatt v. State*, 78 So. 3d 512, 533 (Fla. 2011); *Asay v. State*, 769

So. 2d 974, 986 (2000). By not directly asking for Dr. McClain's ultimate opinion on insanity, counsel presented all of the same evidence that would have supported the defense but precluded the State from eliciting potentially damaging testimony that Covington was sane at the time of the offenses.

Nor was Covington prejudiced by counsel's decision not to present insanity as mitigation. Even if Dr. McClain's opinion on insanity had been presented at the penalty phase, it would have been rebutted by no less than four other experts. It is highly unlikely that the trial court would have made a finding that Covington was insane at the time of the murders; unless the court found the other four experts to be incredible, which it did not, the evidence presented would have weighed against such a finding.

## 2. PET and qEEG Scans

Covington next argues that trial counsel was ineffective for failing to obtain a PET scan of his brain and present the results at the penalty phase. Covington alleges that he was prejudiced because a PET scan would have shown significant brain impairment that would have been highly mitigating. He also argues that counsel was ineffective for failing to move for reconsideration of the

motion to admit the qEEG[3] evidence once Covington waived a penalty phase jury, and that it violates due process and equal protection for the trial court here to have barred the qEEG evidence, while a court in Miami-Dade County has permitted qEEG evidence in another capital trial.

At the evidentiary hearing, Dr. Wood, a neuropsychologist retained by Covington for postconviction purposes, testified that a PET scan was conducted on Covington in 2019. The scan was conducted in Jacksonville by a scanner that has been in operation since long before Covington's trial and has a 500-pound weight limit. According to Dr. Wood, the PET scan showed "thinning of the brain tissue in the left auditory cortex," which is "a possible mechanism for some of [Covington's] reported hallucinations," hypoactivity of the anterior cingulate, which "organizes and commits an organized behavior to the muscles of the body" and is related to "impulsive, reactive aggression, not to carefully planned aggression."

---

3. As explained in this record, a qEEG "is a technique that puts electrodes around the scalp and tries to localize brain function, either normal or impaired, under this bank of electrodes."

Counsel James testified at the evidentiary hearing that a pretrial qEEG was conducted on Covington and a *Frye*[4] hearing was held, because qEEG scans were new and novel in the Thirteenth Circuit. James intended to use neuroimaging to provide additional corroboration for Covington's bipolar diagnosis, although she already "had enough medical records to corroborate" his bipolar diagnosis.

Beginning early in her representation of Covington, James began consulting with experts to determine whether Covington had some brain dysfunction or neurological injury that could be developed as mitigating evidence. In the summer of 2008, Dr. Krop conducted a series of neuropsychological tests on Covington but found no deficits. He advised that Covington's neuropsychological testing indicated that his frontal lobe is essentially within normal

---

4. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The *Frye* standard is used to determine the admissibility of expert opinion testimony that relies upon a new or novel scientific principle, theory, or methodology. Under *Frye*—the applicable standard in Florida until 2019—the principle, theory, or methodology on which the opinion evidence is based must be scientifically valid, and the procedures followed to apply the technique or process must be generally accepted in the relevant scientific community.

limits. It was explained to James that neuropsychological testing is the "gold standard," meaning it "is the best or primary diagnostic tool to ascertain the existence of frontal lobe or cognitive impairment." Nonetheless, James still pursued neuroimaging, consulting with more experts.

An MRI and EEG of Covington's brain were also done pretrial and came back normal, except the MRI showed some mild diffuse atrophy, which at least two experts considered not to be a significant finding. Several experts advised James that a PET scan would not likely be revealing based on the results of other testing, but James continued to pursue one, eventually consulting with Dr. Wu, whom she knew to be "a nationally-recognized medical doctor with specialty in neuroimaging," who often testified "on behalf of criminal death penalty defendants pertaining to neurological issues and neuroimaging."

Dr. Wu advised that a PET scan would show abnormalities in individuals with bipolar disorder, which interested James because she was seeking corroboration of the bipolar diagnosis. Dr. Wu further noted that some PET scan facilities have a 300- or 350-pound weight limit (Covington weighed approximately 350-375

pounds) and that Covington might need to be weaned off his medications—Seroquel and Depakote[5]—for a short time because they might show up as an artifact on the scan. When James indicated that it was probably unadvisable to take Covington off his medications, Dr. Wu advised that the scan could still be conducted, but that the Depakote might reduce temporal lobe abnormality and produce a false negative.

James testified that she was concerned about weaning Covington off his medications because he had previously been confrontational with the deputies at the jail, received a disciplinary report, and felt paranoid that some of the deputies were targeting him. Also, Dr. Weaver, who treated Covington at the jail, had advised that Covington's medications were still being modified, so he was not stable. James noted that Covington's prior violent episodes, such as the murders and the killing and dismembering of his ex-wife's cats, occurred when he was off his medications. She was concerned that taking him off his medications for a PET scan

---

5. Seroquel is an antipsychotic. Depakote is a mood stabilizer.

might trigger episodes of rage or violence, which could have affected his health and his case. Counsel Holt echoed James's concerns about Covington's potential behavior while off his medications and finding a facility to accommodate his weight. Even Covington did not think going off his medications was in his best interest, because, he said, the only time that he felt good and could control himself was when he was on medication. After her investigation and after consultation with Dr. Wu and other experts and some PET scan facilities, and considering Covington's physical problems, weight, weaning him off of his medications, and numerous experts telling her that they did not think a PET scan would be favorable anyway, James eventually decided not to pursue one further.

Dr. Lawrence Holder testified at the evidentiary hearing that although there is a lot of research pending about PET scans, "right now there are no accepted uses for PET imaging in psychology or behavioral areas." Dr. Holder reviewed Covington's postconviction PET scan images and his pretrial CT scan and MRI and found them to be normal, with only some mild age-related changes.

In light of the advice of the numerous experts consulted that neuropsychological testing is the "gold standard" for determining

brain function and that a PET scan was unlikely to be revealing, as well as the difficulty in finding a PET scan machine to accommodate Covington's size or weight, potential security and transportation issues, the ongoing adjustments to his medication at the jail, and Dr. Wu's recommendation that Covington should be weaned off of his medication when Covington's history contained extensive documented evidence of aggression and violence when not on proper medication, the postconviction court concluded that counsel made a reasonable decision under the circumstances not to pursue a PET scan.

The postconviction court also found that Covington failed to establish that he was prejudiced by the lack of a PET scan, because any finding of organic brain damage presented in the postconviction proceedings would not warrant a new penalty phase, and Dr. Holder's testimony that the PET and CT scans were normal—which was consistent with previous reports finding that Covington's neuropsychological testing, MRI, and EEG were also normal—was more credible than that of Covington's postconviction experts. The postconviction court found no evidence that his psychological or neuropsychological examinations were in any way "grossly

insufficient" or that any indicators of brain damage or dysfunction were ignored.

The postconviction court also found no merit to Covington's argument that counsel should have renewed the motion to admit qEEG evidence once Covington waived the penalty phase jury. When ruling on the motion, the trial court specifically directed the parties to file argument as to "whether, assuming *arguendo*, the Court concluded that the proposed evidence does not satisfy the *Frye* standard for admissibility, such evidence should notwithstanding be admissible in a death penalty second phase sentencing proceeding, or in a *Spencer* hearing proceeding." Therefore, the trial court considered the admissibility of the qEEG in the absence of a penalty phase jury and concluded that it was inadmissible regardless of the presence or absence of a jury. The postconviction court did not err in denying relief on this claim.

As to Covington's allegation that counsel was deficient for failing to obtain a PET scan, we agree with the postconviction court's conclusion that counsel made a reasonable, strategic decision to forego a PET scan under the circumstances. Several experts told counsel that a PET scan was unlikely to yield favorable

results.  She was also told that a PET scan could only be used in conjunction with neuropsychological testing, but because the neuropsychological testing did not reveal any abnormalities, there was nothing for a PET scan to corroborate.  Counsel was also concerned that by taking Covington off his medications, he might engage in violent or threatening behaviors that could jeopardize other aspects of his case.  These were reasonable concerns, and such behaviors could have had a detrimental effect on the mitigation and lessened Covington's chance of receiving a life sentence.  Further, because counsel was able to successfully establish Covington's bipolar disorder without a PET scan, there was no deficient performance even if PET scan results would have provided more corroboration of the diagnosis.  "As this Court has held, 'even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.' " *Wheeler v. State*, 124 So. 3d 865, 881 (Fla. 2013) (quoting *Darling v. State*, 966 So. 2d 366, 377 (Fla. 2007)); *see also Downs v. State*, 740 So. 2d 506, 516 (Fla. 1999) (affirming the trial court's denial of claims that counsel was ineffective for

failing to investigate and present additional mitigating evidence that was cumulative).

For the same reason, the lack of a PET scan did not prejudice Covington. Counsel was only interested in a PET scan as additional corroboration of Covington's bipolar disorder, for which she already had sufficient corroboration through medical records, and because she already had sufficient corroboration, the sentencing court found that the existence of Covington's bipolar disorder was established and substantially mitigating. Thus, there is no reasonable probability that having additional corroboration of a mitigating circumstance that was already sufficiently established would have resulted in a life sentence.

Covington's allegation that counsel was ineffective for failing to move for reconsideration of the motion to admit the qEEG in the penalty phase once Covington waived a penalty phase jury also fails. Even in the absence of a jury, the qEEG would not have satisfied *Frye*, so there would have been no reason for the court to reconsider its ruling that the qEEG was inadmissible at the penalty phase. Because "counsel cannot be deemed ineffective for pursuing futile motions, trial counsel cannot be deemed to have performed

deficiently in this regard." *Gordon v. State*, 863 So. 2d 1215, 1219 (Fla. 2003).

Nor is Covington entitled to relief on his claim that it violates due process and equal protection for the trial court in Hillsborough County to have barred qEEG evidence in Covington's capital penalty phase, while another court in Miami-Dade County permitted the defense to present qEEG evidence in another capital trial. Because this claim should have been raised on direct appeal, it is procedurally barred. *See Dailey v. State*, 283 So. 3d 782, 793 (Fla. 2019) (stating that claims that "could have been, should have been, or were raised on direct appeal" are procedurally barred).

### 3. Interrogation/Confession Video

Covington next asserts that the postconviction court erred in denying his claim that counsel was ineffective for failing to move to redact his videotaped interrogation to exclude references to prejudicial and inflammatory matters, including collateral offenses. When detectives interviewed Covington at the sheriff's office on May 14, 2008, he admitted to the murders and discussed events that preceded them. Counsel attempted to have the entire statement suppressed, but when that motion was denied, counsel sought to

- 28 -

have the statement admitted in its entirety under the doctrine of completeness, as opposed to allowing the State to redact portions.

At the evidentiary hearing, James acknowledged that the videotaped interrogation included various subjects that were disturbing, including the prior cat mutilations, child abuse, domestic violence, and other collateral offenses. But James planned to introduce most of those facts as mitigation through the experts to show the seriousness of Covington's mental health issues and to support her overall penalty phase theme. According to James, "the bottom line" for the penalty phase was that the defense "knew that a lot of this stuff was going to come in any way through the testimony of [their] medical experts when they did the detailed history of [Covington's] mental health episodes."

Counsel Peacock testified that once the motion to suppress was denied, a strategic decision was made to object to redacting the tape for purposes of completeness. He testified that evidence of the cat mutilations, substance abuse, and violent and suicidal acts would have been presented through Dr. McClain's testimony whether or not it was going to come out in the confession tape. Peacock testified that what is symptomatic of severe mental illness

is conduct or behavior that may not be flattering to a defendant through a layperson's eyes, and that was especially true in Covington's case.

In denying relief on this claim, the postconviction court found the testimony of counsel to be credible that after the motion to suppress the video recorded statement was denied, they made the strategic decision to allow the unredacted statement to be admitted in its entirety for purposes of completeness and to support the severity of Covington's mental health issues and the overall mitigation theme. The court found credible counsel's testimony that the defense wanted to portray the disturbing facts in the video as symptoms of Covington's serious mental illness, and found those statements were consistent with the penalty phase theme that the mental health system had failed Covington. Thus, the court concluded that the decision to allow admission of the unredacted statement was reasonable under the circumstances, and Covington failed to demonstrate that counsel performed deficiently.

The postconviction court also found that Covington failed to demonstrate prejudice where the disturbing facts mentioned in the video were raised in the testimony of the defense's mental health

experts to explain Covington's extensive mental health history and support their diagnoses.

We find no error in the trial court's conclusion that counsel made a reasonable, strategic decision to ask for the confession video to be admitted in its entirety. At the penalty phase, counsel used Covington's history of illicit drug use and the cat mutilations as a way for Dr. Buffington to explain his opinion that the murders were likely the result of a violent bipolar episode. This strategy was ultimately successful because the sentencing court noted that the murders likely resulted from Covington's mental health issues, including bipolar disorder and substance abuse disorder and afforded great weight to that mitigating circumstance. Other defense experts gave testimony about the other disturbing facts in the video as well. Under these circumstances, we agree that trial counsel made a reasonable, strategic decision to object to the State's efforts to introduce a redacted version of Covington's video recorded statement. The postconviction court did not err in denying this claim, and Covington is not now entitled to relief.

### 4. Waiver of Pretrial Objections and Motions

Covington next argues that the trial court erred in denying his claim that counsel was ineffective for waiving pretrial objections and motions and that the State denied Covington due process and contributed to counsel's ineffectiveness. In his motion for postconviction relief, Covington alleged that trial counsel was ineffective for "waiv[ing] objection to all of Mr. Covington's statements to police as well as all evidence of collateral crimes committed by him," which "caused the trial court to hear damning evidence that contributed to the finding of aggravators and discounting of mitigators." He also alleged that counsel "failed to preserve for appellate review Mr. Covington's various motions to suppress and motions to exclude collateral crime evidence," specifically: a motion to suppress the statements made to law enforcement while Covington was a patient at University Community Hospital; a motion to suppress statements made on the confession tape (the same motion addressed above); a motion in limine to exclude evidence that Covington committed acts of child abuse against the two child victims; and a motion in limine to

exclude any evidence that Covington told a sheriff's deputy that he had a history of prior drug use.

On appeal, Covington disagrees with the postconviction court's finding that counsel was not deficient for failing to continue to object to admission of the evidence discussed in the pretrial motions because "counsel was aware that allowing any of this evidence would be damaging to the fight for their client's life." Initial Br. of Appellant at 71. He essentially argues that the trial court was wrong to deny the motions and therefore counsel should have preserved them for appellate review.

The postconviction court did not err in denying relief on this claim. As explained in the previous issue, counsel made a reasonable, strategic decision not to object to the admission of Covington's video recorded statement and the mention of the collateral crimes—potential child abuse and drug use—contained therein.

Section 921.141(1), Florida Statutes (2014), governed admissibility of evidence at a capital penalty phase and stated that

> evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant . . . . Any such evidence that

the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.

Thus, even if all portions of the motions in limine regarding child abuse and drug use were granted as to the guilt phase, the evidence that would have been excluded at the guilt phase still would have been admissible at the penalty phase. Further, as previously explained, it was a reasonable, strategic decision not to object to admission of this evidence during the penalty phase and to instead use it as evidence of Covington's serious mental health issues.

Because section 921.141(1) does not authorize the introduction of any evidence secured in violation of the United States or Florida Constitution, the two motions to suppress could have survived Covington's guilty pleas. But again, as previously explained, counsel made a reasonable, strategic decision not to object to the admission of any part of the video recorded statement at the penalty phase. Regarding the statements made while Covington was a patient at the hospital, he does not explain when

these statements were admitted at the penalty phase or how they were used against him. He has therefore insufficiently briefed this claim as to those statements and is not entitled to relief.

### 5. ASPD and Psychopathy

Next, Covington argues that the trial court erred in denying his claim that counsel was ineffective for failing to object to and adequately rebut Dr. Myers and Dr. Lazarou's diagnosis of antisocial personality disorder (ASPD) and to refute and object to the use of the bad character evidence of Covington being a psychopath.

At the penalty phase, trial counsel presented testimony from three mental health experts, Drs. McClain, Krop, and Rao, who opined that Covington does not have ASPD. In rebuttal, the State called Drs. Myers and Lazarou who opined that Covington does have ASPD. Regarding psychopathy, Dr. Myers testified that ASPD is "another term really for what would be criminal personality or psychopathic personality." Dr. Lazarou also testified that Covington met the criteria for psychopathy.

At the evidentiary hearing, Covington presented testimony from Dr. Cunningham, a clinical and forensic psychologist. Dr. Cunningham did not refute Drs. Myers and Lazarou's diagnosis of ASPD; rather, he felt that it was not the best explanation for Covington's conduct the night of the murders. He also stated that even if Covington has ASPD, it does not explain his conduct relating to the murders, particularly the mutilation and dismemberment of the children. Dr. Cunningham disagreed with the State's trial experts that Covington is a psychopath. Dr. Cunningham also testified that ASPD and psychopathy do not rebut or diminish the mitigation.

Counsel James testified that she was aware prior to the penalty phase that the State was going to introduce evidence that Covington had ASPD and it was her understanding that ASPD encompassed psychopathy. Based on Dr. Lazarou's pretrial deposition in which she discussed her opinion that Covington is a psychopath, James advised her experts that she wanted them to be prepared to rebut the State's experts' opinions that Covington is a psychopath and has ASPD. When asked whether she considered asking one of her experts to administer the Hare Psychopathy

Checklist to Covington to see if he would be disqualified as a psychopath, James responded that she does not tell her experts what type of tests to conduct, but instead relies on their knowledge.

In denying relief on this claim, the postconviction court first found no deficiency, because counsel was entitled to rely on the evaluations conducted by the qualified mental health experts. The court also noted that Drs. McClain, Rao, and Krop not only testified regarding their diagnoses of bipolar disorder, but also explained how they ruled out ASPD, and therefore, Dr. Cunningham's postconviction testimony refuting or even explaining ASPD was substantially cumulative to the testimony presented at the penalty phase. The court cited *Jennings v. State*, 123 So. 3d 1101, 1116 (Fla. 2013), in concluding that even if Dr. Cunningham provided additional information or a different perspective regarding ASPD, the fact that a defendant has "produced more favorable expert testimony at his evidentiary hearing is not reason enough to deem trial counsel ineffective."

The postconviction court found no prejudice was demonstrated because the sentencing order did not reflect that the trial court found that Covington has ASPD or is a psychopath.

Instead, the trial court found that "Covington suffered from a long-standing condition of bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder," and accorded that mitigating circumstance great weight.

The postconviction court did not err. There is competent, substantial evidence in the record to support the finding that James's testimony regarding her efforts to rebut Drs. Myers and Lazarou's diagnosis of ASPD was credible. And this Court will not substitute its judgment for that of the postconviction court as to the credibility of witnesses so long as the findings are supported by competent, substantial evidence. *See Lowe v. State*, 2 So. 3d 21, 29-30 (Fla. 2008).

The records made in both the trial and postconviction proceedings reflect that James was aware of the State's intent to introduce evidence of ASPD and psychopathy in advance of trial and that she took reasonable actions with her experts to counter that testimony. The penalty phase record reflects that counsel presented testimony from at least three experts who testified that Covington does not have ASPD. There was also evidence introduced at the evidentiary hearing substantiating James's claim that she

spoke with at least one expert regarding the necessity for him to be able to adequately counter the diagnosis of the State's experts. Introduced at the evidentiary hearing was a pretrial memo written by James, memorializing a phone conference with Dr. Rao on September 16, 2014, in which James advised him that she wanted him to be able to use specific documents to support his diagnosis to counter Dr. Lazarou's use of specific documents to support her ASPD diagnosis. And Dr. McClain testified at the evidentiary hearing that she was made aware prior to penalty phase that Drs. Myers and Lazarou were going to testify that Covington met the criteria for ASPD, so in anticipatory rebuttal, she testified at the penalty phase that, in her opinion, Covington does not meet the criteria for ASPD.

James also testified at the evidentiary hearing (and the trial record reflects) that she filed a pretrial motion to exclude any evidence regarding future dangerousness, including psychopathy, which was granted as to future dangerousness, but did not preclude the State from introducing testimony that Covington has ASPD.

The postconviction court also properly concluded that Covington failed to demonstrate prejudice. The sentencing court noted that it would consider evidence of ASPD to the extent that it rebuts evidence presented by Covington that he has bipolar disorder. Nonetheless, the sentencing order does not reflect a finding that Covington has ASPD or that he is a psychopath, but it does reflect that he "suffered from a long-standing condition of bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder," and great weight was accorded to that mitigating circumstance. Thus, even if trial counsel had presented Dr. Cunningham at the penalty phase in addition to or in lieu of the experts that were called, there is no reasonable probability that Covington would have received a life sentence, because the testimony of the State's experts regarding ASPD and psychopathy did not preclude the trial court from finding that Covington suffered from "bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder" and assigning great weight to that mitigating circumstance. Covington is not entitled to relief on this claim.

### 6. Substance Abuse as Mitigation

Covington next argues that the trial court erred in denying his claim that trial counsel was ineffective for failing to fully develop and present substance abuse as a mitigating factor. He claims that trial counsel was ineffective for failing to argue in the sentencing memorandum that Covington's history of drug use was a distinct mitigating factor independent of its interaction with his severe mental illness, and as a result, "the State was allowed to present poly-substance use disorder as an aggravating factor and mislead with an inaccurate, uneducated, and scientifically unsupported picture of completely voluntary substance abuse." Initial Br. of Appellant at 92. Covington avers that had defense counsel not been ineffective, the trial court would have considered his history of substance abuse disorder purely as mitigation and afforded it great weight.

At the penalty phase, numerous defense experts—Drs. McClain, Krop, Rao, Suarez, and Weaver—testified that in addition to his bipolar disorder, Covington has alcohol, cocaine, and/or polysubstance abuse disorder. In the sentencing order, the trial

court found as a mitigating circumstance accorded great weight that

> Mr. Covington suffered from a long-standing condition of bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder. At the time he committed the homicides he was under the influence of voluntary use of cocaine and alcohol, and was not properly medicated for his documented mental condition because it had been interrupted in part because of insurance issues, and in part because of Mr. Covington's own choices and decisions, albeit knowing that cocaine and alcohol abuse would trigger his rage and violence.

At the evidentiary hearing, Dr. Cunningham testified that the most powerful factors in determining whether drug and alcohol dependence is volitional are "heredity and mood disorder". He explained that

> the person that has this sort of predisposition from mood disorder or from a hereditary predisposition, when they use drugs or alcohol—it triggers an experience in them that is fundamentally unlike what it creates in me. And so we each get a choice, but we don't get the same choice. We get a choice that is shaped by our metabolism.

In denying this relief on this claim, the postconviction court found no deficiency because counsel relied on her experts to advise her of Covington's mental health mitigation, and the sentencing court ultimately found that Covington "suffered from a long-

standing condition of bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder," and accorded that circumstance great weight. The postconviction court also found that Dr. Cunningham's postconviction testimony did not refute the testimony presented at trial that Covington was aware that his episodes of rage and violence were precipitated by his cocaine and alcohol use, and there was no reasonable probability that Covington would have received a life sentence had counsel presented Dr. Cunningham's testimony at the penalty phase or argued that substance abuse was a mitigating factor in itself.

The postconviction court did not err in denying relief on this claim. First, Covington's allegation that counsel was deficient for failing to argue in the sentencing memo that Covington's drug use should be considered a mitigating factor separately from his mental illness does not overcome the "highly deferential" judicial scrutiny under which attorney conduct is analyzed. *Strickland*, 466 U.S. at 689. Even assuming it was an "error" not to parse out substance abuse as a separate mitigating circumstance, it cannot be considered "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

at 687.  Second, the State did not urge, and the sentencing court did not find, that Covington's polysubstance abuse was an aggravating factor.

Further, Covington did not allege in his postconviction motion that counsel's alleged deficiencies here prejudiced him such that but for the alleged deficiencies, the result of the proceeding would have been different.  While he claims that had defense counsel not been ineffective, the trial court would have considered his history of substance abuse disorder purely as mitigation and afforded it great weight, the trial court did afford great weight to the fact that "Covington suffered from a long-standing condition of bipolar disorder, intermittent explosive disorder, and cocaine and alcohol abuse disorder."  Further, even if the trial court did separate substance abuse into its own mitigating circumstance, Covington does not assert that the result would have been a life sentence.

### 7.  Child Abuse and People from the Past

In his final claim of ineffective assistance, Covington argues that the trial court erred in denying his claim that counsel was ineffective for failing to present evidence of child abuse and testimony from important people in his past.

He asserts that counsel failed to obtain Dr. Lazarou's handwritten notes, which indicated that he had suffered abuse as a child, and which should have been presented. He further asserts that counsel was deficient for failing to investigate and speak with Katherine Black, an ex-girlfriend of Covington's, whose testimony at the penalty phase would have shown that he had a warm relationship with a female.

At the penalty phase, Melissa Pulianas, a former co-worker of Covington's, testified that Covington became her closest friend in 2002, for about two years, and he was one of the nicest people she had ever met, who helped her through a time when she hit rock bottom with her depression by being her shoulder to cry on and encouraging her. She was "absolutely dumbfounded" to hear about the murders because she never saw anything in Covington that would have given her "the slightest indication that anything like this could have ever happened." William Taylor, a very good friend of Covington's from high school also testified at the penalty phase, describing Covington as well-liked by everyone, the kind of guy who would do anything for you, and happy go lucky. When he learned about the murders on the news, Taylor was "blown away" and

"couldn't believe it," because the Covington he knew would never do something like that. There was no testimony at the penalty phase that Covington was abused as a child.

At the evidentiary hearing, James testified that although she had Dr. Lazarou's notes reflecting the child abuse, she chose to present the evidence on which her trusted experts relied. All of the evidence she had, based on her review of records and her discussions with her experts and family members, was that Covington was not physically abused. Covington never told her that he was physically abused, and she "had no evidence, other than this one statement by Dr. Lazarou, that he was physically abused. Nothing from Mr. Covington himself or family members, nothing in any medical records." It was very clear to James that Covington wanted to continue to enjoy an amicable relationship with his parents, did not want to publicly expose any violence within the family dynamic, and was, to a certain extent, limiting matters to be presented at the penalty phase. James explained that Covington did not want to risk harming the family dynamics, "so the decision was made with Mr. Covington of how [the defense] would proceed in certain areas." James said, "He was very firm in how he wanted his

- 46 -

family to be perceived," "so those are some decisions that were made with Mr. Covington's acquiescence, and, really, his direction if you don't like putting word [sic] in his mouth, but those were the things that he preferred."

Counsel Holt testified that while Covington told his defense team that he had been spanked by his father, he did not indicate that there had been years of abuse. Covington did not describe the spankings in any terms that would lead her to believe they went beyond the "usual or normal" corporal punishment that some families use.

Katherine Black testified at the evidentiary hearing that she dated Covington for around eight months in 1992 and 1993, when she was around eighteen and he was around twenty years old, but she had not seen him since 1993. She described Covington as compassionate, helpful, and sober, and never violent toward her. She never saw any bout of depression or any behavior resembling mania. She lived with Covington and his family for four to six months. She knew Covington respected his parents and was close with his father. Covington never told her that his father physically

abused him, and she never witnessed any abuse against him or his sister.

In denying relief as to the allegation that counsel was ineffective for failing to present evidence that Covington was physically abused by his father, the postconviction court found the testimonies of James and Holt credible that neither Covington nor any of his family members ever advised his attorneys that he was physically abused by his father and that he minimized evidence of spanking or corporal punishment. The court found reasonable James's decision not to present evidence of child abuse where the only reference to the abuse was found in one of the State's expert's notes and there was no other corroborating evidence. The court also found no prejudice, because even if the defense had presented testimony or evidence regarding the references in Dr. Lazarou's notes, in light of the evidence, the mitigators, and the aggravators presented, there was no reasonable probability that Covington would have received a life sentence.

As to the failure to present the testimony of Katherine Black, the postconviction court found no deficiency because her testimony was largely cumulative to the penalty phase testimonies of Melissa

Pulianas and William Taylor. Additionally, the trial court found as a mitigator that Covington "has the ability to form positive friendships." The postconviction court also concluded that even if Katherine Black had testified at the penalty phase, there is no reasonable probability that Covington would have received a life sentence.

The postconviction court did not err in denying relief on this claim. At the outset, it should be noted that Covington's allegation that trial counsel failed to obtain Dr. Lazarou's notes is incorrect. The record is clear that counsel moved pretrial to obtain Dr. Lazarou's notes, and the State provided them in discovery. James also testified at the evidentiary hearing that she had the notes prior to trial.

Both James and Holt testified that Covington did not want evidence of violence in his family introduced at the penalty phase. The postconviction court found that testimony credible and that finding is not challenged. "As the Supreme Court noted in *Strickland,* 'the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.' " *Cherry v. State*, 781 So. 2d 1040, 1050

- 49 -

(Fla. 2000) (quoting *Strickland*, 466 U.S. at 691). Where there is proof that counsel spent substantial effort on the case and was familiar with the mitigation, but also evidence that the defendant interfered with trial counsel's ability to present mitigating evidence, this Court will not overrule a trial court's conclusion that counsel's performance was not deficient. *Power v. State*, 886 So. 2d 952, 961 (Fla. 2004); *see also Sims v. State*, 602 So. 2d 1253, 1257-58 (Fla. 1992) (concluding that counsel could not be considered ineffective for honoring the defendant's wishes where the defendant directed counsel not to collect other mitigating evidence). And to the extent that counsel relied on her experts and the fact that they did not discover any evidence to indicate that Covington suffered child abuse, this Court has previously held that "[c]ounsel cannot be found deficient for relying on the evaluations of qualified mental health experts, 'even if, in retrospect, those evaluations may not have been as complete as others may desire.'" *Carter v. State*, 175 So. 3d 761, 775 (Fla. 2015) (quoting *Jennings*, 123 So. 3d at 1116). Thus, the postconviction court did not err in concluding that Covington failed to establish deficient performance.

As to the failure to present the testimony of Katherine Black at the penalty phase, there is competent, substantial evidence in the trial record to support the conclusion that Black's testimony would have been largely cumulative to the testimonies of Melissa Pulianas and William Taylor, which the trial court relied on to find as a mitigator that Covington "has the ability to form positive friendships." "[T]rial counsel is not ineffective for failing to present cumulative evidence." *Darling*, 966 So. 2d at 378. Thus, there was no deficient performance. Covington was also not prejudiced by the failure to present cumulative evidence. *See Dufour v. State*, 905 So. 2d 42, 61 (Fla. 2005) (holding that defendant failed to demonstrate prejudice where additional mitigating evidence did not substantially differ from that presented during the penalty phase); *Atwater v. State*, 788 So. 2d 223, 234 (Fla. 2001) ("There is no reasonable probability that re-presenting virtually the same evidence through other witnesses would have altered the outcome in any manner.").

## C. Cumulative Error

The totality of Covington's argument of cumulative error is: "Due to the errors that occurred individually and cumulatively, this Court should grant relief from this unconstitutional death

sentence." Initial Br. of Appellant at 99. Because Covington has not demonstrated error, deficiency, or prejudice as to any of his claims, the claim of cumulative error fails. *See Whitton*, 161 So. 3d at 333 ("As discussed above, Whitton is not entitled to relief on any of his claims and is therefore not entitled to relief based on cumulative error.").

## III. PETITION FOR A WRIT OF HABEAS CORPUS

In addition to his postconviction appeal, Covington filed a petition for a writ of habeas corpus in this Court, in which he raises two claims.

### A. New Proportionality Analysis

Covington first argues that this Court should reconduct its proportionality analysis to ensure accordance with the Eighth Amendment's prohibition against cruel and unusual punishment. While Covington recognizes our recent decision in *Lawrence v. State*, 308 So. 3d 544, 550-52 (Fla. 2020), *cert. denied*, 142 S. Ct. 188 (2021), in which we held that the conformity clause in article I, section 17 of the Florida Constitution prohibits us from undertaking comparative proportionality review, Covington urges us to recede from *Lawrence* and conduct a new proportionality

analysis in this case, taking into account that Covington was insane at the time of the murders. Covington is not entitled to relief on this claim for several reasons.

First, the claim is procedurally barred, in more ways than one. The first sentence Covington writes in support of this claim is "In Claim III of Mr. Covington's 3.851 Motion filed February 28, 2019, he argued in part that his proceedings 'were inadequate to determine whether his case was the most aggravated and least mitigated.'" Pet. for Writ of Habeas Corpus at 4. The fact of the matter is that while claim III of the postconviction motion did not discuss *Lawrence* and argued that Covington should be entitled to relief under *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), despite waiving a penalty phase jury, the title of it states, "The proceedings in Mr. Covington's case were inadequate to determine whether his case was one of the most aggravated and least mitigated," which is the very heart of this claim in the Petition. And in denying claim III of the postconviction motion, the postconviction court specifically noted that part of that claim was that "the procedure employed here 'was constitutionally inadequate to place Mr. Covington's case in the most aggravated and least mitigated.'" Thus, because

Covington did attack this Court's proportionality review in his postconviction motion, it is procedurally barred in his habeas petition. *See Smith v. State*, 126 So. 3d 1038, 1053 (Fla. 2013) (stating that claims that were raised in a postconviction motion "are not properly presented in a petition for a writ of habeas corpus").

This claim is also procedurally barred because the proportionality of Covington's death sentence was raised and decided on direct appeal. "Habeas corpus is not to be used to relitigate issues determined in a prior appeal." *Bolender v. Dugger*, 564 So. 2d 1057, 1059 (Fla. 1990). Not only is Covington attempting to relitigate the proportionality of his death sentence, he is trying to do so with additional mitigation—his alleged insanity—which was not found by the trial court to have been established.

As to the merits of this claim, Covington asserts that this Court should reconduct the proportionality analysis to ensure accordance with the Eighth Amendment's prohibition against cruel and unusual punishment. But the Eighth Amendment does not require a comparative proportionality analysis. *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984) ("There is . . . no basis [in Supreme Court case law] for holding that comparative proportionality review by an

appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *Lawrence*, 308 So. 3d at 548. Thus, a new proportionality analysis would not ensure accordance with the Eighth Amendment, nor would it be any different than the original analysis since no court has found that Covington was insane at the time of the murders. This Court is tasked with assuring that death sentences imposed in Florida comport with the Eighth Amendment, whether or not they are comparatively proportional. And Covington has made no compelling argument to support his request that this Court recede from *Lawrence.* We therefore deny relief on this claim.

## B. Whether Covington's Death Sentences Violate the Sixth, Eighth, and Fourteenth Amendments

Covington claims that his

death sentence[s] violate[] the Eighth and Fourteenth Amendments to the United States Constitution because Mr. Covington's severe mental illness exempts him from the death penalty based on evolving standards of decency and because Mr. Covington's case is not the most aggravated and least mitigated. The process for determining Mr. Covington's death sentence was inadequate, thus denying him due process under the Fourteenth Amendment and further violating the Eighth Amendment by failing to accurately determine whether his case belonged in the class of cases that may lead to a death sentence. To the extent that the arguments that

follow could have been developed and presented by trial counsel, trial counsel was ineffective, thus denying Mr. Covington his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

Pet. for Writ of Habeas Corpus at 25-26.

Similar to the previous claim, the very first paragraph Covington writes in support of this claim acknowledges that it was, at least in part, raised in his motion for postconviction relief:

Mr. Covington's death sentence is unconstitutional because evolving standards of decency have reached the point where someone suffering from the severe mental illness that Mr. Covington does cannot constitutionally be sentenced to death. This claim was made in Claim II of the Petitioner's 3.851 Motion, but was denied as the lower court found "that mental illness is not a categorical bar to a death sentence."

*Id.* at 26.

By Covington's own admission, this claim was raised in his postconviction motion and rejected. The record confirms this. Thus, the claim that evolving standards of decency bar Covington's execution due to his mental illness, is procedurally barred. *See Smith*, 126 So. 3d at 1053 (stating that claims that were raised in a postconviction motion "are not properly presented in a petition for a writ of habeas corpus"). This claim is also procedurally barred

because it could have been raised on direct appeal. *Dailey*, 283 So. 3d at 793.

The other subclaims raised here—that the process for determining Covington's death sentence was inadequate and that trial counsel was ineffective—were previously raised and therefore also procedurally barred. They are also insufficiently pleaded, as they are not discussed at all within this claim. *See Wheeler*, 124 So. 3d at 889-90 (denying a claim as insufficiently pleaded where the appellant "completely failed to make any legal argument to support" the claim). Covington is therefore not entitled to relief on this claim.

## IV. CONCLUSION

For the reasons stated above, we affirm the postconviction court's order denying Covington's motion for postconviction relief and deny the petition for a writ of habeas corpus.

It is so ordered.

MUÑIZ, C.J., and CANADY, POLSTON, LABARGA, LAWSON, COURIEL, and GROSSHANS, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Hillsborough County,

Michelle Sisco, Judge - Case No. 292008CF009312000AHC
And an Original Proceeding – Habeas Corpus

Eric Pinkard, Capital Collateral Regional Counsel, David D. Hendry and Cortney L. Hackett, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant/Petitioner

Ashley Moody, Attorney General, Tallahassee, Florida, and Marilyn Muir Beccue, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee/Respondent